## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LAWRENCE BELKIN, INDIVIDUALLY AND AS NEXT OF KIN OF GAIL BELKIN,**

**Plaintiff,**

**v.**

**ISLAMIC REPUBLIC OF IRAN,** *et al.,*

**Defendants.**

Case No. 06-00711 (PLF)

## PLAINTIFF'S PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW

Plaintiff Lawrence Belkin, individually and as next of kin of Gail Belkin, by and through undersigned counsel, hereby submits the following proposed findings of fact and conclusions of law based on the sworn affidavits, exhibits, and other evidence submitted to the Court in this matter in support of the entry of a default judgment in this action. This case arises from the 1996 murder in Israel of Plaintiff's wife as the result of a suicide bombing sponsored by Defendants and carried out the Palestinian Islamic Jihad.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

1.    On April 20, 2006, Plaintiff filed his Complaint in this Court seeking, *inter alia,* compensation for his emotional distress and loss of accretions due to the wrongful death of his wife Gail Belkin.[1]

---

[1] Counts I-IV of the Complaint charge Defendants with wrongful death, a survival action, loss of consortium and intentional infliction of emotional distress under District of Columbia state law. Counts V-IX charge wrongful death, aggravated assault, violations of human dignity, and violations of international treaty obligations under the laws of Israel. Count X charges Defendants with violation of customary international law (*jus cogens*).

2.    In accordance with 28 U.S.C. § 1608(a) and 22 C.F.R. § 93.2, Plaintiff caused the Complaint, Summons and Notice of Suit, along with translations of each, to be served on each Defendant, namely the Islamic Republic of Iran, Iran's Ministry of Information and Security, and the Islamic Revolutionary Guard Corp of Iran.

3.    Service of process was attempted by DHL on each Defendant pursuant to 28 U.S.C. § 1608(a)(3) on July 6, 2006 and on August 18, 2006.  The DHL package was refused on August 26, 2006, and the return receipt was returned unexecuted on August 28, 2006.  Docket Entry No. 5.

4.    The Summonses were reissued on November 1, 2006; and on December 12, 2006, the Clerk of the Court was requested to assist with service of process under 28 U.S.C. § 1608(a)(4).  Docket Entry No. 8.

5.    Service of process was further attempted by diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) commencing on December 11, 2006 by letter request to the Clerk of the Court.  The Clerk transmitted the service documents to the State Department on January 25, 2007.  Docket Entry No. 9.  The documents were transmitted via the Embassy of Switzerland to Iran's Ministry of Foreign Affairs on April 22, 2007 under cover of diplomatic notes, numbers 1069-IE and 1070-IE.  The Ministry of Foreign Affairs returned the documents, but service was effective as of April 22, 2007 per 28 U.S.C. § 1608(c)(1).  *See* Docket Entry No. 10; *see also* Plaintiff's Exhibit 1.

6.    Defendants' Answer was due on June 21, 2007.  Defendants failed to enter any appearance and failed to respond by that date.  No responses have been made by any Defendant to date.

7.      On July 2, 2007, Plaintiffs requested the entry of default, which was entered by the Clerk on July 6, 2007.

8.      On July 27, 2007, Plaintiffs moved for default judgment. Docket Entry No. 14. Notwithstanding Defendants' willful default, the Court must conduct an evidentiary hearing pursuant to 28 U.S.C. § 1608(e) to determine whether sufficient evidence has been presented to support a judgment by default.

## II.    FINDINGS OF FACT

1.      Plaintiff Lawrence Belkin is a United States citizen, born and raised in Pennsylvania. After graduating Phi Beta Kappa from the University of Michigan in 1969, he served three years in the U.S. Army and then four more years in the Army Reserves. After his active duty discharge, he attended graduate schools in North Carolina where he received Masters Degrees in both Architecture and Regional Planning. He worked in North Carolina from 1973 until mid-1981 when he moved to Israel and opened his own architectural design firm. Plaintiff's Exhibit 2, Belkin Declaration.

2.      When Mr. Belkin moved from North Carolina to Israel in 1981, he no longer maintained any residences or substantial contacts with any particular state in the United States. At the time he considered Israel to be his permanent residence. He did maintain general contacts with the United States government including filing his U.S. income tax returns each year while he resided in Israel. *Id.* at ¶ 6.

3.      Lawrence Belkin married Gail Belkin on March 23, 1995. Gail had been born in Rhodesia and also lived in South Africa before she immigrated to Israel. English was her native language. By profession, she was a cosmetician and ran a successful business. She became a citizen and resident of Israel. At the time of her death, she was 48 years of age and had two adult daughters from a previous marriage. *Id.* at ¶ 10.

4.      At the time of his marriage to Gail, Mr. Belkin was a widower with two children. His first wife died suddenly six years earlier when her car collided with a truck. As a result of the tragic loss of his first wife, Belkin felt compelled to be the best husband he could to Gail, and was very close to her. He made it a point to tell her every day how much he loved her, and often told her how he dreaded the thought of losing her through death as he did his first wife. Gail was to be his companion for the rest of his life. *Id.* at ¶ 8.

### The March 4, 1996 Bombing Incident

5.      On the afternoon of March 4, 1996, Gail Belkin, her mother, and one of her daughters went shopping in the Dizengoff Center Shopping Mall in Tel Aviv, Israel. Her daughter was engaged to be married. After a time, the daughter remained in the mall shopping by herself while Gail and her mother went outside.

At approximately 4:00 p.m. on March 4, 1996, a suicide bomber affiliated with the Shaqaqi faction of the Palestinian Islamic Jihad ("PIJ") detonated a 40-pound bomb that he was carrying just outside the doors of the shopping mall in the vicinity of Gail Belkin and her mother. Gail Belkin and her mother, plus 11 other individuals, were killed in the blast, and 125 other individuals were injured. *Id.*; Plaintiff's Exhibit 3, Expert Report of Dr. Patrick Clawson ("Clawson Report") at 5, 8.[2]

6.      The PIJ suicide bomber was identified as Ramez abed el Kader Machmad Abid, a resident of the Chan-Yuness refugee camp in Gaza. He was a known activist in the PIJ with the Shaqaqi faction. The police investigation determined that Abid had been smuggled into Israel

---

[2] Dr. Patrick Clawson has provided sworn expert testimony concerning the PIJ, Iran, MOIS and the IRGC. In *Heiser* v. *Islamic Republic of Iran*, Dr. Clawson is described as a "renowned scholar of Middle Eastern politics, who has studied and written about Iran for years. In over 20 cases, Dr. Clawson has repeatedly provided this Court with reliable and credible testimony regarding the involvement of Iran, MOIS and IRGC in sponsoring and organizing acts of terrorism carried out against citizens of the United States (citations to footnoted cases omitted). 466 F.Supp.2d 229, 265 (D.D.C. 2006) (Lambert, J.).

that day by a truck driver traveling from Gaza to Tel Aviv.  Clawson Report at 6, 8.  *See*
Plaintiff's Exhibit 4, Israeli Police Report, Event 27126 ("Israeli Police Report").

7.      Abid carried the bomb in a black bag with two carrying handles.  The main
explosive was approximately 15 kilograms of TNT, around which were packed number 10 nails
so as to cause maximum pain, suffering, and death to anyone in the vicinity of the detonation.
The explosion was triggered by power from 9 volt batteries.  When he arrived at the Dizengoff
Center, he attached the bag to his shoulders.  *Id.*

8.      The truck driver, Said Bin Hussain Sulimany, was subsequently indicted and
prosecuted for smuggling Abid into Israel for the equivalent of $1,100 and for assisting in
murder and sabotage.  Sulimany, who was convicted for providing support to terrorists, admitted
that he knew Abid was a PIJ member and that he was paid the equivalent of $1,100 by a PIJ
leader to smuggle Abid into Tel Aviv.  Clawson Report at p. 6.

9.      Both the PIJ and Hamas[3] claimed responsibility for the Dizengoff Center
bombing.  There is evidence that Hamas provided the bomb and that the PIJ provided the suicide
bomber and facilitated his transportation to Tel Aviv where the bomb was detonated.  The PIJ
and Hamas are known to have collaborated in other terrorist bombings, including an April 6,

---

[3] Hamas, which is the popular name for the Islamic Resistance Movement (Harakat al-
Muqawama al-Islamiya), is an organization that has been supported over the years by the Islamic
Republic of Iran, primarily through Iran's Ministry of Information and Security ("MOIS"), and
its Revolutionary Guard Corps.  There are numerous opinions by judges of this Court which have
found that Iran not only is a major source of support for Hamas, both financially and in terrorist
training, but also that Iran fully knew the purposes and objectives of Hamas and approved of
them.  *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 124 ¶ 16; *Campuzano
v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 262 (D.D.C. 2003); *Stern v. Islamic Republic of
Iran,* 271 F.Supp.2d 286 (D.D.C. 2003); *Mousa v. Islamic Republic of Iran,* 238 F.Supp.2d 1, 3
(D.D.C. 2001); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C. 2002);
*Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1, 5 (D.D.C. 2000); *see also In re Abu
Marzook,* 924 F. Supp. 565 (S.D.N.Y. 1996).

1994 incident where the suicide bomber in a car-bomb attack on a bus in Afala, Israel was a member of the PIJ, but the bomb was provided by Hamas. *Id.* at 6-7.

10. The context for the PIJ's bombing of the Dizengoff Center was the ongoing peace discussions between Palestinian President Yassar Arafat and Israel. Iran, as well as its various agents, Hamas and the PIJ, was strongly opposed to any kind of recognition of Israel and sought the violent rejection of the Middle East peace process. On February 28, 1996, Iranian Vice President Habibi met with Hamas leaders and PIJ leaders (Ramadan Abdallah Shallah) in Damascus, Syria. It was reported that Habibi stressed the continuation of Iran's support for the Palestinian oppositionists working against the peace agreement. Plaintiff's Exhibit 5, Patterns of Global Terrorism, 1996; Clawson Report at 4. This statement and meeting occurred in the middle of several major bombings in Israel, including two February 25, 1996 bombings: one of a bus in Jerusalem[4] and the other of a soldier's hitchhiking station in Ashkelon, plus a subsequent bombing of another bus in Jerusalem on March 3, 2006. There is strong evidence that the Dizengoff Center bombing was actually planned to occur on February 25, 1996 in coordination with the two other bombings that did occur that day, but it did not occur simply because the truck driver, who was to drive the suicide bomber into Tel Aviv, did not show up that day. Dr. Clawson opined that it was reasonable to conclude that Iran's Vice President Habibi discussed with PIJ leader Shallah Iran's support for the PIJ's suicide bombings against the Israelis. The Dizengoff Center bombing happened a few days later. *Id.* Credible reports describe how Iran pledged to increase support based on major terror killings carried out by the PIJ. Clawson Report at p. 2.

---

[4] This bombing has spawned four terrorism cases in this Court: *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74 (D.D.C. 2006); *Mousa v. Islamic Republic of Iran,* 238 F.Supp.2d 1 (D.D.C. 2001); *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C. 2002); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C. 2000).

11.     The autopsy of Gail Belkin was performed by forensic pathologists Yehuda Hiss, M.D. and R. Nachman, M.D.  They found that she had suffered first and second degree burns on her head, neck, trunk, and limbs.  There were numerous lacerations in those same areas.  Most significantly, the force of the explosion caused fractures of her cranial and facial bones as well as her ribs.  It was the opinion of the forensic pathologists that the cause of Gail Belkin's death was the detonation of explosives.  Plaintiff's Exhibit 6, Autopsy Report.

12.     As a result of the death of Gail Belkin, her estate suffered a loss of accretions. This loss is based on a projected work history of 19 additional years to retirement age and then receipt of a pension for 15 years to her life expectancy of 82.7 years, based on the Israeli Bureau of Statistics life expectancy tables.  The total lost accretions for those 34 years is reduced to present value is $376,848.  She also had funeral expenses totaling $3,710.  The total amount is $380,558.  *See* Plaintiff's Exhibit 10, Economic Report of Dov. Weinstein, CPA ("Weinstein Report").

13.     Lawrence Belkin suffered severe emotional distress as the result of the bombing and gruesome death of his wife.  While not present at the Dizengoff Center at the actual time of the bomb's detonation, he learned about the bombing very shortly after it occurred, and he was immediately filled with anxiety knowing that his wife was then at the shopping center.  The entire country of Israel was at a heightened state of tension and fear as the result of the spate of bombings that had recently happened and which took the lives of numerous innocent civilians, many of them children.  The anxiety immediately increased with the television media immediately broadcasting photographs of the massive damage at the area around the Center.  He was sickened as he watched the special crews of workers scouring the scene for every piece of human flesh that could be recovered, in accordance with Jewish law.  *See* Belkin Declaration at

¶ 10; *see also* Plaintiff's Exhibit 7 (DVD of Israeli news showing post-bombing activity outside the Dizengoff Center).

Larry Belkin's anxiety further increased with each call to a hospital which responded that it had no information about a Gail Belkin, and that they should consider calling the morgue. Within hours of the bombing, he was taken to the morgue to view the body of a woman believed to be his wife. The body was so severely injured in the blast that he could not identify it as Gail while viewing it. He was only able to identify the jewelry that she was wearing, particularly her distinctive wedding ring. Belkin Declaration, ¶ 11.

For over two years after his wife's death, Larry Belkin attended group therapy sessions to deal with his grief and emotions. The program was operated by the Israeli government and all of the participants were spouses of victims of terrorism. Even into 2004, eight years after Gail's murder, he was treated by his physician for "Generalized Anxiety disorder" which was attributed to Gail's death and his experiences in Israel. On occasion, he still experiences an overwhelming sense of anxiety associated with the events of Gail's death. Belkin Declaration, ¶¶ 12-14.

In 2001, Lawrence Belkin decided to move back to the United States to an environment of greater quiet and less intensity. He currently resides in the Commonwealth of Virginia. *Id.* at ¶ 14.

### The Palestinian Islamic Jihad

14. The Palestinian Islamic Jihad was founded by Sunni Islamic fundamentalist Fathi Shaqaqi in the 1970s. Almost from the outset, PIJ leaders have proudly proclaimed their close connection with the Iranian government. In 1981, Fathi Shaqaqi wrote a book about his admiration for the Islamic Republic of Iran. Particularly remarkable about the PIJ's long affiliation with Iran is how they have always worked together cooperatively notwithstanding the longstanding disagreements between the Sunni and Shia Muslim factions, on both religious and

socio-economic grounds.  PIJ leaders traveled frequently to Iran, often being shown in the

Iranian media meeting with top officials in the Iranian government.  The PIJ actively defended

Iran and its ideology to Sunni extremists who were put off by Iran's Shiite majority.  Clawson

Report at 2-3; Plaintiff's Exhibit 8, Dr. Clawson's testimony in *Flatow v. Islamic Republic of

Iran,* Civil Action No. 97-396 (March 3, 1998) ("Clawson's Testimony"), pp. 146-147.

15.    After the 1987 outbreak of a Palestinian popular uprising against Israel, the PIJ

was the group which most loudly and openly proclaimed the need for terrorist attacks on Israeli

civilians at a time when most other Palestinian extremists thought such attacks were unwise

tactics.  The Shaqaqi faction of the PIJ was relatively small, numbering a few hundred members,

but were particularly violent.  For the next 12 years, the PIJ had few activities other than carrying

out terrorist acts (unlike other terrorist groups such as Hamas and Hezbollah which also

undertook charitable and political activities).  Clawson Report at 2-4; Clawson Testimony at p.

148; Plaintiff's Exhibit 9, Testimony of Harry B. Brandon in *Flatow v. Islamic Republic of Iran,*

Civ. Action No. 97-396 ("Brandon Testimony") p. 174.

16.    The PIJ has been found responsible for many other terrorist attacks in Israel

including the April 9, 1995 bus bombing in which Alisa Flatow was killed and Seth Haim was

severely injured.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998); *Haim v.

Islamic Republic of Iran*, 425 F.Supp.2d 56 (D.D.C. 2006).

### Iran's Support for the PIJ

17.    In the mid-1990s, Iran had an urgent desire to disrupt the Middle East peace

process which appeared to be moving forward at that time.  Iran considered terrorist activities in

Israel and the wanton murder of Israeli civilians carried out by the PIJ as an effective means of

damaging relations between Israel and the Palestinian Authority.  By supporting the PIJ, Iran

enhanced its standing with radical Islamic extremists, especially among Sunni Muslims who

would otherwise be hostile to the Shiite Islamic Republic of Iran.  Iran provided the PIJ not only

with financing, but also with advanced military training, and munitions technology that allowed

the PIJ to evolve into a dangerous and effective terrorist organization.  Clawson at p. 2.

18.     In 1990, after Fathi Shaqaqi arrived in Damascus, PIJ operatives began training at

Hezbollah camps in Lebanon under supervision of Iranian Revolutionary Guards stationed in that

country and carried out some joint operations with Hezbollah against Israeli forces in south

Lebanon.

19.     The strong consensus among scholars of Palestinian extremism is that from 1988

until about 2000, the PIJ was heavily dependent on Iranian government support.  Several experts,

including Dr. Reuvan Paz and Harry B. Brandon, the former Chief of the FBI's Counterterrorism

Section, opined in 1998 that the Iranian government was virtually the sole support of the PIJ.  In

a 1994 interview of Fathi Shaqaqi by Arab journalists, Shaqaqi denied the accepted figure that

the PIJ was receiving $20,000,000 that year from Iran but admitted receiving $3,000,000 to

support PIJ terrorism.  Clawson Report at p. 4; Plaintiff's Exhibit 9, Brandon Testimony, p. 176.

20.     The Iranian Ministry of Information and Security, during the 1990s and beyond,

acted as a conduit for the Islamic Republic of Iran's provision of funds and training to the

Shaqaqi faction for its terrorist activities in the Gaza strip region.  Clawson Report at p. 5.

21.     The PIJ's dependence on Iran deepened after the 1995 death of Fathi Shaqaqi.[5]

Shaqaqi's successor Shallah faced the challenge of showing that the PIJ was still an important

force, especially as the larger Hamas organization had stepped up its terroristic activities.  In the

weeks prior to the Dizengoff bombing, Hamas had stepped up its activities to undermine Arafat

and the Palestinian Authority.  On the day before the Dizengoff bombing, in response to Israeli

_____

[5] Fathi Shaqaqi was shot and killed on October 26, 1995 by an unknown but professional
assassin generally believed to be an Israeli operative.

pressure following the spate of suicide bombings, Arafat outlawed paramilitary organizations including Hamas and the PIJ, and Palestinian police arrested 800 Islamic militants and seized large quantities of explosives.

22.     The Patterns of Global Terrorism 1996, covering acts of global terrorism in that year, stated "Iran remained the premier state sponsor of terrorism in 1996....  Iran continued to provide support – including money, weapons and training – to a variety of terrorist groups, such as Hizbollah, Hamas and the Palestine Islamic Jihad ("PIJ")."  Plaintiff's Exhibit 5.

23.     Iran was designated a state sponsor of terrorism in 1984 and has been on the State Department's list of state sponsors of terrorism ever since.  *See Dammarell v. Islamic Republic of Iran,* 404 F.Supp.2d 261, 273-74 (D.D.C. 2005) ("*Dammarell IV*"); *see also* 22 C.F.R. § 126.1(d) (2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979--Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).

24.     Iran uses various organizations to carry out its terrorist support activities.  The Ministry of Information and Security ("MOIS"), Iran's intelligence service, is a major Iranian agency designated by Iran to help organize Iranian government support to the PIJ.  MOIS operates both within and beyond Iranian territory.  With approximately 30,000 agents, MOIS is the largest intelligence agency in the Middle East.  MOIS acted as a conduit for Iran's provision of funds and training to the Shaqaqi faction of the PIJ for its terrorist activities.  Iran's intelligence services facilitate and direct terrorist attacks.  MOIS' provision of material support and resources for terrorism is conducted with the approval of the highest levels of the Iranian

regime and falls squarely within the meaning of 28 U.S.C. § 1605(a)(7). Clawson Report at 5, 7; *accord, Haim,* 425 F.Supp.2d at 61; *Flatow,* 999 F. Supp. at 11.[6]

25.    Another means by which Iranian support to terrorism is carried out is through the Iranian Revolutionary Guard Corps ("IRGC"), the activities of which are carefully controlled by the Iranian government. Since 1988, scores of PIJ operatives from the West Bank and Gaza have received Iranian military and other training at training bases run by the IRGC in Lebanon and in Iran itself. Iran has provided the PIJ with explosives and weapons; and the training required to use such weapons. It is reasonably believed that these weapons came from IRGC stocks or through IRGC channels. Clawson Report at 7-8.

26.    Dr. Clawson opined, to a reasonable degree of certitude, that the Islamic Republic of Iran, through its agencies MOIS and the IRGC, provided funding and training to the PIJ prior to March 4, 1996, as well as after that date, in order to facilitate the PIJ's ability to carry out terroristic activities, including suicide bombings, and particularly the suicide bombing on march 4, 1996 of the Dizengoff Center. Such training would include how to operate explosive devices and how to achieve maximum death and destruction. Funding is also required at various levels, including payment for transportation (smuggling) the suicide bomber through Israeli security to the place of detonation.

---

[6] Although not necessary to the resolution of this case in accord with 28 U.S.C. § 1608(e), the Court can and does take judicial notice of facts and conclusions made by Judge Lamberth in the *Flatow* and *Haim* cases. While the event underlying those two cases occurred 11 months prior to the event in this matter, the longstanding relationship between Iran and the PIJ found by the Court in those two cases (that were decided eight years apart) is relevant to this case, particularly so because they are so consistent. *See Heiser*, 466 F.Supp.2d at 262-263; *Haim,* 425 F.Supp.2d at 60; Fed. R. Evid. 201(e).

III.    **CONCLUSIONS OF LAW**

    A.    **Jurisdiction**

In the United States, the Foreign Sovereign Immunities Act ("FSIA") establishes a broad rule that foreign states are immune from suit in United States courts. The statute also sets out certain exceptions to the rule for limited categories of cases. Thus, the FSIA provides the sole basis for asserting jurisdiction over foreign sovereigns. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-34 (1989). A party may not generally bring an action for money damages in U.S. courts against a foreign state. 28 U.S.C. § 1604. The "state-sponsored terrorism" exception set forth at 28 U.S.C. § 1605(a)(7), however, removes a foreign state's immunity to suits for money damages brought in U.S. courts where plaintiffs seek damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in Section 2339A of Title 18) for such an act if such act or provision of material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency." *Id.; Heiser*, 466 F.Supp.2d at 304 (D.D.C. 2006),

In order to subject a foreign sovereign to suit under section 1605(a)(7), a plaintiff must show that: (1) the foreign sovereign was designated by the U.S. State Department as a "state sponsor of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser*, 466 F.Supp.2d at 305, *citing Prevatt v. Islamic Republic of Iran*, 421 F.Supp.2d 152, 158 (D.D.C. 2006) (Lamberth, J.).

Each of the requirements is met in this case. First, Defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. *See* 22 C.F.R. § 126.1(d); 31 C.F.R. § 596.201 (2001); *Flatow v. Islamic Republic*

*of Iran,* 999 F. Supp. 1, 11 ¶ 19 (D.D.C. 1998).  Second, the Plaintiff was a United States citizen when the murder of Decedent occurred.  Finally, Defendant Iran's persistent financial and organizational material support of the entity or entities that committed an extrajudicial killing squarely falls within the ambit of the statute.[7]  Defendants MOIS and the IRGC are considered to be a division of the State of Iran, and is therefore treated as a member of the State of Iran itself. *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004); *see also Salazar*, 370 F.Supp.2d at 116 (analogizing the IRGC to the MOIS for purposes of liability, and concluding that both must be treated as the State of Iran itself). Therefore, the same determinations that apply to the conduct of MOIS and the IRGC apply to the conduct of Iran.

**B.**    **Service of Process**

Personal jurisdiction exists over a non-immune sovereign as long as service of process has been made under section 1608 of the FSIA.  *See Stern v. Islamic Republic of Iran,* 271 F.Supp.2d at 298 (D.D.C. 2003); *see also* Fed. R. Civ. P. 4(j).  In this case, service of process has been effected on all three Defendants under § 1608(a)(4).  *See* Plaintiff's Exhibit 1. Accordingly, this Court has *in personam* jurisdiction over defendants Iran, MOIS and the IRGC.

**C.**    **Legal Standard for FSIA Default Judgment**

As previously mentioned, in an action over which subject matter jurisdiction exists by virtue of the "terrorism exception" of  28 U.S.C. § 1605(a)(7) "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state … unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C.

---

[7] The FSIA utilizes the same definition of "extrajudicial killing" as the Torture Victim Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized people."  *See Peterson v. Islamic Republic of Iran,* 264 F.Supp.2d 46, 61 (D.D.C. 2003).

§ 1608(e); *Roeder,* 333 F.3d at 232-33. In default judgment cases, plaintiffs may present such evidence in the form of affidavits. *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d at 82; *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 250, 268 (D.D.C. 2003). Upon evaluation, the court may accept any uncontroverted evidence presented by Plaintiffs as true. *Heiser*, 466 F.Supp.2d at 255 (*citing Campuzano*, 281 F.Supp.2d at 268). This Court accepts and credits the uncontested evidence and testimony submitted by Plaintiffs as true, not only in light of the fact that the Defendants in this action have not objected to it or even appeared in this action to contest it, but also because it is relevant and highly probative of the claims asserted.

**D.    Liability**

1.    *Proper Causes of Action Under the FSIA*

The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in either federal, state or international law." *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 54 (D.D.C. 2006); *see Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024, 1027 (D.C. Cir. 2004). As the forum jurisdiction, the District of Columbia's choice of law rules apply to determine which state's law shall govern. *Bodoff v. Islamic Republic*, 424 F.Supp.2d at 79 (D.D.C. 2006).[8]

**E.    Choice of Law**

District of Columbia courts apply a so-called "refined government interest analysis,"[9] pursuant to which they "evaluate the government policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the

---

[8] Normally, the law of the United States applies rather than the law of the place of the tort or any other foreign law because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *Heiser,* 466 F.Supp.2d at 266. *See Dammarell,* 2005 WL 756090 at \*20, 2005 U.S. Dist. LEXIS 5343 at \*63 ("*Dammerell II*").

[9] Also referred to as a "modified government interest analysis." *Heiser*, 466 F.Supp.2d at 266.

facts of the case under review." *Bodoff*, 424 F.Supp.2d at 83, *quoting Hercules & Co., Ltd. v.*

*Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989); *see also Haim v. Islamic Republic of Iran*, 425

F.Supp.2d 56, 68-69 (D.D.C. 2006). When this test is applied, it "typically leads to the

application of the law of the plaintiff's domicile, as the state with the greatest interest in

providing redress to its citizens." *Id.,* 425 F.Supp.2d at 69 *citing Dammarell I.* 2005 U.S. Dist.

LEXIS 5343 at *66-67.

In the particular circumstances of Lawrence Belkin, he moved his permanent to Israel in

1981. At the time, he maintained his contacts with the United States by filing his U.S. tax

returns each year, but he did not maintain any affiliation with any particular state. This state of

affairs was in place in March 1996 when Gail Belkin was killed by the suicide bomber.

Where, as here, the victims of terrorism are United States citizens with no current

domicile in the United States at the time of the terrorist activity, the District of Columbia has

"the greatest interest" for choice of law purposes and its law will be applied. *See, e.g.*, *Bodoff*,

424 F.Supp.2d at 83-84; *Haim*, 425 F.Supp.2d at 69. Therefore, as to the IIED, survival action,

and loss of consortium claims of Lawrence Belkin, District of Columbia law shall apply.

### F.    Substantive Vicarious Liability for the Torts Committed the PIJ

The substantive basis of the Defendants' liability is that they at a minimum engaged in

the "provision of material support" to the PIJ, which carried out the terrorist bombing of the

Dizengoff Center and caused the death of Gail Belkin. The acts of another may render a party

liable "under theories of vicarious liability, such as conspiracy, aiding and abetting and

inducement." *Haim*, 425 F.Supp.2d at 69. The Court will examine the applicability of each of

these theories, as deemed necessary.[10]

---

[10] Where the facts found by the Court suffice to establish any one of these bases of vicarious
liability, the Court need not go further. *See, Haim* at 69.

1.   *Vicarious Liability*

The asserted basis of Defendants' liability is that they provided material financial support and resources to the PIJ, the terrorist organization whose members planned and executed the suicide bombing in which Gail Belkin was killed.  Under the theory of vicarious liability, a party may be liable for the acts of another, under rubrics including conspiracy, aiding and abetting, and inducement.  Accordingly, this Court finds that at a minimum, that civil conspiracy provides a basis of liability in this case against Defendants Iran and MOIS, provided such a theory exists under District of Columbia law.  *See Heiser,* 466 F.Supp.2d at 266-268.

2.   *Civil Conspiracy*

Civil conspiracy is also recognized under District of Columbia law as a basis for imposition of vicarious liability for civil torts.  It exists when the following elements are present: (1) an agreement between two or more persons or entities; (2) to participate in an unlawful act or in an otherwise lawful act in an unlawful manner; (3) that an injury or death or other damages caused by an unlawful overt act performed by one of the parties to the agreement and (4) pursuant to or in furtherance of the common scheme.  *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) *citing Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

It is axiomatic that the "agreement" element "may be inferred from conduct."  *Bodoff*, 424 F.Supp.2d at 84 *citing Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001); *see also Haim*, 425 F.Supp.2d at 69.  Plaintiffs have established based on the evidence submitted to this Court, most notably the Clawson Report, Exhibit 3, that Iran, MOIS, the IRGC and the PIJ acted in concert because they had agreed to commit high profile terrorism activities to promote Iran's brand of revolutionary Islamic ideology and to further the goal of damaging Israel and its citizens as well as United States interest whenever possible.  *Id.* at pp. 3-4.  Such agreement may also be inferred from the substantial financial support and training that Iran, MOIS and the IRGC

provided to the PIJ. *See, id.,* pp. 2-4. The very "'sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts.'" *Bodoff*, 424 F.Supp.2d at 84, *quoting Flatow,* 999 F. Supp. at 27.

The evidence also clearly establishes that the PIJ carried out the sequence of tortious conduct which killed Decedent. *See* Clawson Report, pp. 5-7. Dr. Clawson's Report also demonstrates to the satisfaction of this Court that torts alleged by Plaintiffs were carried out in "furtherance of the scheme" between the PIJ, Iran, MOIS, the IRGC, and likely Hamas, to disrupt the Middle Eastern peace talks. *See, id.* at p. 6. For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to the Defendants and the PIJ perpetrators. *See also Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 108-109 (D.D.C. 2007) (civil conspiracy basis for vicarious liability established with respect to Iran and MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks in Beirut).

### 3.    *Other Bases of Vicarious Liability*

There is also clear evidence here for adjudicating Iran, MOIS and the IRGC as liable under vicarious liability theories which are separate and distinct from civil conspiracy. Iran has provided initiative and the approval of the funding, and likely directly or indirectly provided the deadly explosive to carry out the terrorist attack at issue here. *See* Clawson Report, pp. 7-8. As a result of its action, through its agents MOIS and IRGC, these Defendants are also liable for aiding and abetting as well as inducement of the deadly terrorist bombing. *See* 18 U.S.C. §§ 2(a), 2(b); s*ee also Bodoff*, 424 F.Supp.2d at 84. In addition to conspiracy, aiding and abetting and inducement are legal theories upon which a court may predicate vicarious liability. *See Halberstam,* 705 F.2d at 481-486.

In conclusion, there exist multiple legal bases for the imposition of vicarious liability on Defendants Iran, MOIS and the IRGC for the torts of the PIJ.

### G.    Intentional Infliction of Emotional Distress

District of Columbia law governs as to the IIED claim asserted by Plaintiff Lawrence Belkin.  The elements of the IIED tort under District of Columbia law are "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the Plaintiff severe emotional distress.  *Bodoff*, 424 F.Supp.2d at 85, *citing Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984).  Based on the evidence submitted in this case, these elements are satisfied here.  It is well established that "a terrorist attack constitutes extreme and outrageous conduct."  *Bodoff,* 424 F.Supp.2d at 85; *see also Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002) (Jackson, J.) ("[A]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally terror.")  The second element of the IIED tort is also established here as the suicide bombing was carried out intentionally and recklessly.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F.Supp.2d 261, 275 (D.D.C. 2005) (Bates, J.) (elements of District of Columbia IIED found to be satisfied in 1983 bombing of U.S. Embassy in Beirut); *see also Bodoff*, 424 F. Supp. at 85.

The third element of causing the plaintiff severe emotional distress is amply demonstrated here.  Lawrence Belkin has established in detail in his Declaration the severe emotional distress that resulted from the brutal murder of his wife.

As a final note, the recent discussion by Judge Lamberth in *Peterson v. Islamic Republic of Iran,* is acknowledged where Judge Lambert pointed out that the District of Columbia's highest Court is among a number of state supreme courts which have yet to address the question of whether in a terrorist attack case, a plaintiff's physical presence is required to permit immediate family members to recover IIED damages.  *See Peterson,* 2007 U.S. Dist. LEXIS

65820 at * 21-22.  This Court does not find the issue of presence to be an impediment to finding Defendants liable for IIED.  As in *Heiser,* it was held that even under the law of a jurisdiction which has not decided the presence issue in a terrorist attack context, presence is not required. *Id.,* 466 F.Supp.2d at 305; *see also Peterson* at 20-21, n. 11.

*Heiser* reached this conclusion to dispense with a presence requirement "in light of the severity of [a terrorist attack] and the obvious range of potential grief and distress that directly results from such a heinous act" and because "a terrorist act" by its nature is directed not only at the victims, but also the victims' families."  466 F. Supp. at 305, 328-29; *accord Dammarell IV,* 404 F.Supp.2d at 283; *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F.Supp.2d 86, 108 (D.D.C. 2003).  The District Court in *Beaty v. Islamic Republic of Iraq*, 480 F.Supp.2d 60, 93-99 (D.D.C. 2007) reached a similar conclusion, noting "[i]n treating close relatives of victims as themselves direct victims of the terrorist attacks, the courts have unmistakenly (but only implicitly) applied § 46(1) of the Restatement, which governs direct victims and which has no presence requirement."  *Id.* at 94 (Bates, J.).  *See also Bennett,* 507 F.Supp.2d at 128-129 (presence not required for a California-based IIED claim).[11]

It also cannot be overlooked in this case that Plaintiff Lawrence Belkin was virtually present throughout the events of this suicide bombing.  He was well aware that his wife was going to the Dizengoff Center, learned of the explosion there shortly after it occurred, and then watched on television as news teams broadcast the chaos and carnage at the scene, including pictures of the "special teams" – who were responsible for collecting all pieces of human flesh – moving about the area.  And unlike many of the IIED family member victims who have

---

[11] Perhaps stating the obvious, presence in a suicide bombing context is a relative term – if a claimant was truly present, he would be a victim rather than a claimant.  It is nearly impossible for a claimant to be immediately present with a decedent in such cases.

recovered IIED damages, he was, within hours, standing next to a battered woman's body that was in fact his wife, but whom he could not even identify due to the extent of her injuries. He was only able to identify her by her wedding ring. As the autopsy photographs in Plaintiff's Exhibit 6 show, she was badly disfigured due to cranial and facial fractures. It is hard to imagine anything that could be more shocking and distressing to a loving spouse. Accordingly, the Court concludes that Lawrence Belkin is entitled to the recovery of damages for IIED caused by the brutal murder of his wife under District of Columbia law.

### H.    Plaintiff's Wrongful Death, Survival and Loss of Consortium Claims

The Complaint pleads wrongful death, survival, and loss of consortium claims under District of Columbia law.[12]  After careful consideration of the law underlying each of these claims the Court concludes that Plaintiff is entitled to recovery on the wrongful death claim but not entitled to recovery as to his survival claim or his loss of consortium claim.

### 1.    *Loss of Consortium*

In the District of Columbia, loss of consortium is a valid cause of action. A spouse may recover damages for loss of consortium due to (a) an injury negligently or deliberately inflicted upon the other spouse or (b) an injury to the mental relationship where no physical harm suffered by spouse. *See Stutsman v. Kaiser Found. Health Plan,* 546 A.2d 367, 372 (D.C. 1988); *Lyles v. Micenko,* 404 F.Supp.2d 182, 189 (D.D.C. 2005). It appears, however, that damages for loss of consortium are only available to a spouse where the other spouse is injured and not where the

---

[12] It also pleads a wrongful death claim (Count V) under Israeli law which will be discussed below.

other spouse has died.  *See Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 565-567 (D.C. Cir. 1993).[13]  Accordingly, Plaintiff's loss of consortium claim must be dismissed.

      2.    *The Wrongful Death and Survival Claims*

      The District of Columbia's Wrongful Death statutes, namely 16 U.S. Code § 2701 *et seq.* and its Survival Statutes, 12 D.C. Code § 101, *et seq.,* each address entirely different types of recoveries and, not infrequently, are for the benefit of entirely different claimants.  A recovery under the Wrongful Death Act is comprised principally of the pecuniary loss of a decedent's share of the decedent's anticipated future earnings (discounted to present value).  Such recovery is solely for the benefit of the decedent's spouse and next of kin.[14]  It creates a remedy for close relatives to the deceased who might in the normal course have expected maintenance or assistance from the deceased had she lived.  *Lewis v. Lewis,* 708 A.2d 249, 251-252 (D.C. 1998); *Doe v. Binker,* 492 A.2d 857, 860-61 (D.C. 1985); *Strother v. District of Columbia,* 372 A.2d 1291, 1295-96 (D.C. 1977); *Semler v. Psychiatric Institute of Washington, D.C.,* 575 F.2d 922, 924-925 (D.C. Cir. 1978); *Runyon v. District of Columbia,* 463 F.2d 1319, 1321-1323 (D.C. Cir.

---

[13] Many cases confuse what the Court ruled in *Joy v. Helicopter Textron, Inc.*  At common law, there was no cause of action available to a surviving spouse or next of kin when an individual died as a result of a wrongful act.  This void would have included, *inter alia,* the tort of loss of consortium.  Thus, any remedy for wrongful death or loss of consortium had to be enacted by statute.  There is no dispute that D.C. has enacted a wrongful death statute ("WDA"), *i.e.,* 16 D.C. Code § 2701 *et seq.*  The issue in *Joy* was whether the independent tort of loss of consortium was included among the other wrongful death recoveries now authorized by 16 D.C. Code § 2701.  What *Joy* concluded, relying on *Ciarrocchi v. James Kane Co.,* 116 F. Supp. 848 (D.D.C. 2953), was that the WDA authorizes recovery only for "pecuniary losses, which include the value of the lost earning and of the personal service and attention which would have been of material value to the members of the family, <u>and not the loss of society and companionship</u>." *Joy,* 999 F.2d at 565, *quoting Ciarrocchi,* 116 F. Supp. at 849-850 (emphasis in original).  The Court in *Joy* subsequently emphasized that it, namely a federal court sitting in a diversity case, was not free to modify or expand the underlying state law despite recent trends in federal cases to expand the scope of wrongful death claims.  *Id.*

[14] The fact that the emotional distress was intentionally caused, as opposed to negligently caused (in negligent infliction of emotional distress claims), further supports under District of Columbia law the award of compensation.  *See, e.g., Parker v. Stein,* 557 A.2d 1319, 1322 (D.C. 1989).  Indeed, D.C. even permits the recovery of punitive damages where the tort is intentional.  *Id.*

1972); *see also* Civil Jury Instructions §§ 14.02 and 14.03 (where both Survival Actions and Wrongful Death Actions are to be considered by the jury in a single trial).

Damages recovered for wrongful death are not "assets of the decedent's estate" and are not appropriate to be used for payment of debts or liabilities of decedents. Rather, any amount recovered in a wrongful death action goes directly to the benefit of the decedent's spouse or next of kin. *Strother v. District of Columbia, supra.* If a person dies as the result of another's negligence but has no spouse or domestic partner or next of kin, there can be no wrongful death recovery. *Niosi v. Aiello*, 69 A.2d 57 (D.C. 1949).

A Survival Action under 12 D.C. Code § 101, on the other hand, preserves for the benefit of the decedent's estate any right of action that the decedent had before his or her death. A Survival Action must be brought by the legal representative of the decedent's estate, and all proceeds recovered by the representative pass to the decedent's estate. *Lewis,* 708 A.2d at 252, *Semler,* 575 F.2d at 925. Such assets may appropriately be used to pay the debts and liabilities of the decedent and do not necessarily have to pass to the decedent's spouse or next of kin. In fact, a survival action may be brought regardless of whether the decedent was married (or domestic partnered) or has next of kin. Any recovery under a Survival claim in excess of decedent's liabilities would be distributed per the decedent's will or the laws of intestacy. *Lewis,* 708 A.2d at 252.

In considering Wrongful Death and Survival Act claims that are brought in an FSIA action, the Court must also consider the nationality or nationalities of the claimants and victims. Under the jurisdictional mandate of § 1605(a)(7), a district court "shall decline to hear a claim under this paragraph of inter alia if "neither the claimant nor the victim was a national of the United States when the act upon which the claim is based occurred." 28 U.S.C.

§ 1605(a)(7)(B)(ii) (parenthetical omitted). Here the victim Gail Belkin was not a U.S. national at the time of her death, but Claimant Lawrence Belkin was a U.S. citizen at the time of his wife's death and continues to be so today.

Based on this undisputed showing of U.S. citizenship, the Court must consider whether Lawrence Belkin is eligible to obtain either a Wrongful Death recovery or a Survival Act recovery, or both, under District of Columbia law or foreign law.

a)    Survival Act Analysis

A survival action is brought on behalf of the deceased's estate and is premised on the legal claim(s) that arose prior to decedent's death. 12 D.C. Code § 101. It merely allows the decedent's executor to stand in the shoes of the decedent and to sue as the decedent could have, had he survived. It puts the decedent's estate in the same posture as decedent had decedent's life not ended prematurely. *Lewis*, 708 A.2d at 252.

A survival action is clearly dependent, from the perspective of 28 U.S.C. § 1605(a)(7)(B)(ii), on the decedent being a U.S. national. This is because in a survival action, both the victim and the claimant (*i.e.,* the victim's estate) are essentially one and the same person. If that person is not a U.S. citizen, the survival action cannot proceed in this Court under the FSIA.

Under 28 U.S.C. § 1605(a)(7)(B)(ii), Plaintiff's survival action is only viable to the extent Gail Belkin could have brought the action herself, had she survived. As Gail Belkin was not a U.S. citizen, there is no basis for her to invoke jurisdiction under the FSIA for her tort claims, assuming she survived. Since there is no basis for jurisdiction, Plaintiff's survival action must be dismissed.

b)    <u>Wrongful Death Analysis</u>

Plaintiff's wrongful death cause of action is entirely different because in a wrongful death case, the claim being made is on behalf of the deceased's spouse and next of kin. Thus, the spouse and next of kin are the real parties in interest and are in fact the claimants. *See* 16 D.C. Code § 2703. Thus, Lawrence Belkin is the claimant in the wrongful death count. In as much as he is a United States citizen, 28 U.S.C. § 1605(a)(7)(B)(ii) is no impediment to the wrongful death cause of action from proceeding as the claimant is a U.S. citizen.

To the extent that *Oveissi v. Islamic Republic of Iran*, 478 F.Supp.2d 268 (D.D.C. 2007) states to the contrary, it can be explained that that case was correctly decided but for the wrong reason.[15] And, nowhere in *Oveissi* was the above theory of jurisdiction – that the claimant is a U.S. national – discussed.

In *Oveissi*, a U.S. citizen brought an action for the wrongful death under the FSIA for the murder of his grandfather, a non-U.S. citizen. The murder occurred in France where the grandfather resided. The district court conducted an analysis more appropriate for a Survival act claim (but not for a wrongful death claim). Under that analysis, the court concluded that the grandfather would have been both the plaintiff (*i.e.,* the claimant) and the victim, and that since this victim/plaintiff was not a U.S. national, he could not recover under the "state sponsored terrorism" exception, 28 U.S.C. § 1605(a)(7)(A)(ii), which requires that either the plaintiff or victim, or both, be a U.S. national. *Id.* at 278.

By contrast, Lawrence Belkin, the plaintiff herein, is the spouse of the decedent Gail Belkin, and thus there is no question that he has standing to bring the wrongful death claim.

---

[15] The wrongful death claim in *Oveissi* was correctly dismissed because as the grandson of the deceased, with a surviving father in between, he lacked standing to bring the wrongful death action because he was not the next of kin, and thus not a beneficiary. Accordingly, while the wrongful death claim should have been dismissed, the basis should have been the same reason that his IIED claim was dismissed: lack of standing.

This, combined with the fact that Lawrence Belkin is the real party in interest to the wrongful

death claim, satisfies the jurisdictional requirements of the FSIA and thus permits his wrongful

death action to proceed.[16]

        c)      Choice of Law for Plaintiff's Wrongful Death Claim

       As noted above, under the District of Columbia's choice of law rules, a court must utilize

a refined government interest analysis under which it evaluates the governmental policies

underlying the applicable laws and determines which jurisdiction's policy would be most

advanced by having its laws applied to the facts of the case.  In post-*Cicippio-Puleo*[17] wrongful

death cases, some courts have looked to the decedent's state of domicile for governing law, *see,*

*e.g., Heiser,* 466 F.Supp.2d at 271-356, while others have looked at the domiciles of the statutory

beneficiaries.  *See Dammarell V,* 404 F.Supp.2d at 281-282.  In *Bodoff, supra,* where the

decedent was never domiciled in any U.S. state, the court applied the forum state's law,

specifically the law of the District of Columbia.  424 F.Supp.2d at 83.  In another recent case

where the decedent did not have a U.S. domicile, the court selected the state jurisdiction that had

the "closest and most substantial connection."  *See Petersen v. Islamic Republic of Iran,* 2007

U.S. dist. LEXIS 65820 at *11.  Here neither the plaintiff nor the decedent had a U.S. domicile at

---

[16] The court in *Oveissi* relied on various comments to § 925 of the Restatement (/Second) of Torts (1971).  Many of the comments to § 925 are more applicable to survival actions than wrongful death actions.  Indeed, all that § 925 "Actions for Causing Death" reads is:  "The measure of damages for causing the death of another depends on the wording of the statute creating the right of action and its interpretation."  All this statement stands for is the recognition that wrongful death statutes and survival statutes are the creatures of state legislatures and that the different states have enacted vastly different statutes.  Some states allow for wrongful death only, some allow survival only, some allow for both in separately enacted statutes, and some allow for both in a single statute.  Section 925 groups the types of American statutes into four categories:  (1) "Damages based on contributions"; (2) damages based on loss to the estate; (3) combined death and survival statutes; and (4) punitive damages.  *Id.*  The basic point being made is that § 925 of the Restatement (Second) is very general and discusses both wrongful death and survival issues.

[17] *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C. Cir. 2004).

the time of decedent's death.  Therefore, either the District of Columbia as the forum state, *a la Bodoff,* or the State of Israel (where the plaintiff and decedent resided at the time of her death and where the death occurred) are the two jurisdictions from whose wrongful death laws this Court must choose.

Unfortunately, the choice of the District of Columbia's law is not free from difficulty insofar as its Wrongful Death Act, by its express terms, creates a cause of action <u>only</u> for deaths arising from injuries inflicted in the District of Columbia.  D.C. Code § 16-2701; *Stewart v. Capitol Area Permanente Medical Group, P.C.,* 720 F. Supp. 3, 10 (D.D.C. 1989); *Higgins v. Metropolitan Area Transit Authority,* 507 F. Supp. 984, 986 (D.D.C. 1981).

Moreover, the District of Columbia has a requirement that wrongful death claims must be brought in the name of the legal representative (even though that person is not acting as the personal representative of the estate and even though that person is merely a nominee for the real parties in interest – the spouse and next of kin).  *See* 16 D.C. Code § 2702; *Saunders v. Air Florida, Inc.,* 558 F. Supp. 1233, 1238 (D.D.C. 1983); *Strother,* 372 A.2d at 1293.

Israel has a wrongful death statute which is charged in Count V, and which is very similar in effect to the wrongful death law in the District of Columbia.  Israeli's Supreme Court has held in *Ettinger Estate v. Jewish Quarter Company,* Civil Appeal 140/00 [2004], IsrLR 97 (15 March 2004) that in an Israeli wrongful death action, designated individuals, specifically the spouse, parents, and children of the deceased, are entitled to compensatory damages for the loss of his earnings capacity in the "lost years" – the years of work "lost" due to the death of the decedent.  *See Ettinger Estate* at p. 129, ¶ 28.  A copy of *Ettinger Estate* is attached hereto as Plaintiff's Exhibit 11.

Although not cited previously in any of the wrongful death choice of law decisions involving § 1605(a)(7) terrorism cases, it appears that the District of Columbia's choice of law determination as to wrongful death claims where the decedent died outside the District of Columbia as the result of injuries which were inflicted outside this jurisdiction is controlled by *Lewis v. Reconstruction Finance Corp.,* 177 F.2d 654, 655-656 (D.C. Cir. 1949). *Lewis* continues to be good law and requires that the law of "the state where the fatal injuries occurred should govern, unless the pubic policy of the forum is clearly opposed." *Smith v. Hope Village, Inc.,* 481 F.Supp.2d 172, 205-206 (D.D.C. 2007)(Walton, J.), *quoting Lewis,* 177 F.2d at 656; *accord,* Restatement (Second) of Conflict of Laws § 175 (1971)(law of place where injury occurred typically governs wrongful death claims); *Stewart,* 720 F. Supp. at 10.

As in *Smith*, where Maryland's substantive law was applied to fatal injuries inflicted on the decedent in Maryland, the interests of the District are substantially advanced by the application of Israeli law to Plaintiff's claim. *See Smith,* 481 F.Supp.2d at 206.

By its very terms, the District of Columbia's wrongful death statute could not apply to Plaintiff Lawrence Belkin's wrongful death claim. But as the forum state, the District of Columbia has no interest whatsoever in the application of its law in such a way as to frustrate the public policy of either the United States or Israel of attempting to deter terrorism through awards of money damages against designated state sponsors of terrorism like Iran. For these reasons, the wrongful death law of Israel does not impinge upon, let alone controvert, any public policy of the forum. In fact, the contrary is true in that both the District of Columbia and Israel have a legitimate interest in compensating victims of terrorism and in awarding judgments against such state sponsors of terrorism.

Under the District of Columbia's choice of law principles, it is appropriate to apply the law of Israel and to award to Plaintiff the lost accretion that he would have otherwise benefited from but for the murder of his wife. Accordingly, the Court will apply the wrongful death law of Israel, which is essentially the same as the District of Columbia's wrongful death law, but without the specific limitation written into D.C.'s statute.

## IV. DAMAGES

### A. Compensatory Damages

To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were "reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a "reasonable estimate consistent with this [Circuit's] application of the American rule on damages. *Salazar*, 370 F.Supp.2d at 115-16 (quoting *Hill v. Republic of Iran*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted). Because there have been so many cases in this District where family members have been killed by terrorist bombings, this Court is by no means writing on a proverbial "clean slate" in fashioning a damages remedy in this case. To the contrary, this Court is guided by remedial approaches and formulas, utilized in similar cars. *Prevatt,* 421 F. Supp. at 160; *Haim*, 425 F.Supp.2d at 71.

### 1. *Plaintiff's IIED Damage Awards*

While the loss suffered by a spouse is difficult to quantify, courts typically award between $8 million and $12 million for the emotional distress resulting from the death of a spouse. *See, e.g., Heiser,* 466 F.Supp.2d at 293; *Greenbaum v. Islamic Republic of Iran,* 451 F.Supp.2d 90, 107-108 ($9 million to husband of woman killed by suicide bomber); *Salazar,* 370 F.Supp.2d at 116 (awarding $10 million to the widow of a bombing victim); *Kerr v. Islamic Republic of Iran*, 245 F.Supp.2d 59, 64 (D.D.C. 2003) (Jackson J.) (award of $10 million to the

widow of a torture and hostage taking victim). One recent award to a spouse was for $30 million. *Estate of Bayani v. Islamic Republic of Iran* (Nov. 19, 2007) ($30 million awarded to spouse whose husband was tortured and executed). *See* Plaintiff's Exhibit 12.

Based upon the wealth of cases involving immediate family members of civilians killed in terrorist bombings, this Court awards IIED damages of $10 million to Lawrence Belkin in his individual capacity as the husband of the Decedent. The Court believes this award is appropriate in this case as it is not unlike the awards to other spouses whose wives or husbands were killed in suicide bombings. *See Greenbaum, supra.* The Court believes, however, that Lawrence Belkin is particularly entitled to this higher award due to the extreme shock he experienced when he had to view his wife's severely disfigured body shortly after the bombing occurred. Such a shocking experience is one that will never be shed and will long continue to cause pain and anxiety. For that reason, the Court will award Lawrence Belkin $10 million on his intentional infliction of emotional distress claim.

2.    *Wrongful Death Damages Award*

Under the District of Columbia Wrongful Death Act, the allowed recovery is based on pecuniary damages which Plaintiff might reasonably be expected to have received from the deceased had she lived. *Lewis*, 708 A.2d at 251-252; *see also Wagner*, 172 F.Supp.2d at 135, n. 11. Here, Plaintiff has submitted a report from forensic economic expert Dov Weinstein, Plaintiff's Exhibit 10, Weinstein Report. The Weinstein Report bases its calculations on reasonable and well founded assumptions about the likely earnings of Gail Belkin had she survived. *Id.*, Exhibit 10. Mr. Weinstein concluded that Mrs. Belkin would have worked for 19 more years and then, based on here life expectancy, received a pension for 15 additional years. Accordingly, based upon this forensic evidence, judgment for her "loss of accretions," reduced to

present value, should be awarded to Plaintiff in the amount of $376,853 and in the amount of $3,710 for her funeral expenses.

**B.    Punitive Damages**

Punitive damages are not awardable against Iran, and recent opinions have unanimously concluded that they are not awardable against MOIS by virtue of 28 U.S.C. § 1606. *See Blais v. Islamic Republic of Iran,* 459 F.Supp.2d at 60; *Prevatt*, 421 F.Supp.2d at 161, n.2 (*citing Roeder v. Islamic Republic of Iran*, 333 F. 3d 222, 234 (D.C. Cir. 2003).

In the past, the IRGC has been treated similarly to MOIS with punitive damages denied based on findings that the IRGC's activities were governmental rather than commercial. *See Prevatt v. Islamic Republic of Iran,* 421 F.Supp.2d at 162 (D.D.C. 2006); *Holland,* 496 F.Supp.2d at 31-32; *Salazar,* 370 F.Supp.2d at 116. It appears, however, that there is a growing body of evidence that the IRGC may be shedding its fundamentalist roots and taking a large role in Iran's economy. The court in *Bayani v. Islamic Republic of Iran*, Civil Action No. 04-1712, Memorandum Opinion dated November 19, 2007 (copy attached at Plaintiff's Exhibit 12), agreed with plaintiffs' presentation that the IRGC has become a commercial entity (which is attached at Plaintiff's Exhibit 13) and awarded $400,000,000 in punitive damages against the IRGC.

This view was recently corroborated by our Secretary of Treasury Henry M. Paulson: "The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are doing business with the IRGC." *See* U.S. Department of State press release dated October 25, 2007 (a copy is attached at Plaintiff's Exhibit 14). Even further detail of the IRGC's commercial activity is documented by an October 2007 publication by the American Enterprise Institute for Public Policy Research "How Intertwined Are the Revolutionary Guards in Iran's Economy?" A copy is attached at

Plaintiff's Exhibit 15. This article carefully documents the IRGC's domination of Iran's oil and gas sectors plus Iran's import-export business. The Court agrees with *Bayani* that there is sufficient evidence to find that the IRGC has become, and increasingly so, a commercial enterprise. The Court will award Plaintiff Lawrence Belkin a punitive damage award of $400,000,000 against the IRGC.

### C.    Prejudgment Interest

It is axiomatic that when a complaint filed after *Cicippio-Puleo* presents state law causes of action, the issue of whether any Plaintiff may recover prejudgment interest is one of state law. Under District of Columbia law, the decision whether to award prejudgment interest even in cases where there is no underlying contractual relationship rests in the discretion of the trial court. *See, e.g., House of Wines, Inc. v. Sumter,* 510 A.2d 492, 499 (D.C. 1986)*; Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.,* 431 A.2d 569, 580 (D.C. 1981)*.* The rate of interest and date from which it runs are also within the sound discretion of the trial court. *Id.* The allowance of prejudgment interest is compensatory in nature. *See Suiter v. Mitchell Motor Coach Sales Inc.,* 151 F.3d 1275, 1289 (10th Cir. 1998). It this goal by compensating a plaintiff "for being deprived of the monetary value of his [or her] loss from the time of the loss to the payment of [the] judgment." *Id.* at 1288; *see also Paper Converting Mach. Co. v. Magna Graphics Corp.* 745 F.2d 11, 23 (Fed. Cir. 1984). In *Ostenreck v. Ernst & Whinney,* 489 U.S. 169, (1989) the Supreme Court opined that prejudgment interest has been traditionally considered part of the compensator award to the Plaintiff. *Id.* at 175. District of Columbia law also clearly affords the trier of facts the ability to award prejudgment interest where it is necessary to compensate the Plaintiff. *House of Wines,* 510 A.2d at 499. *Compare, Ungar, Ex. Rel Strachman v. Palestinian Authority,* 304 F.Supp.2d 232, 237-240 (D.R.I. 2004) (prejudgment interest disallowed as to

federal law as to federal claims brought under the Anti-Terrorism Act of 1990 which provides for treble damages).

An award of prejudgment interest is also appropriate where, as here, punitive damages are as a mater of law unavailable to Plaintiffs.  Nor are the Plaintiffs here entitled to any treble or multiple damages.  *Compare Ungar,* 304 F.Supp.2d at 239-40.  Unlike punitive damages and treble damages which are intended to punish and thus deter, prejudgment interest is purely compensatory in nature.  Moreover, the non-availability of punitive and multiple damages to the Plaintiffs eliminates the situation presented in *Ungar* where superimposing prejudgment interest, in light of the available statutory treble damages, would have overcompensated plaintiffs there to the point of giving them an underserved windfall.  No such situation exists here.  Indeed, here an award of prejudgment interest is necessary to compensate Plaintiffs, as the following discussion will point out.

The application of these principles convinces the Court to exercise its discretion to award prejudgment interest computed on a simple interest basis at a percentage rate per annum which is eminently reasonable.  *See Blake Construction*, 431 A.2d at 580.  The rationale for compensating all of the Plaintiffs here is compelling in that (i) thirteen (13) years will have elapsed from the time of the kidnapping and murder of Decedent through the date this Court renders final judgment, and (ii) Plaintiffs' purchasing power had they been compensated in 1994 with 1994 dollars would have been significantly greater than their much diminished purchasing power using the cheaper dollars as of the date of judgment, let alone further diminution or devaluation by the time a final judgment satisfied in whole or in part.

### D.    Other Causes of Action Asserted in the Complaint

In light of these Findings of Fact and Conclusions of Law, it is not necessary for the Court to address the other causes of action asserted by the Plaintiffs under either Israeli law or

under customary international law for the reasons stated in *Beaty v. Islamic Republic of Iraq,* 480 F.Supp.2d at 92-93.  (Count X).

## V.    CONCLUSION

Because Plaintiff has established severe emotional distress as a direct and proximate result of Defendants' extreme and outrageous conduct and because the evidence in the record amply supports the allegations in the Complaint, a judgment consistent with these findings will be entered against Defendants Iran, MOIS, and the IRGC in the amount of $10 million plus prejudgment interest dated to March 4, 1996 when Gail Belkin was murdered.  The Court awards $376,858 in lost accretion and $3,710 in funeral and burial costs.

In addition, the Court awards $400,000,000 in punitive damages against the IRGC.

A judgment in accordance with these findings and conclusions shall issue this date of

_____, 200__.


Dated:  December 7, 2007                         Respectfully submitted,


                                                 /s/Paul L. Knight_____
                                                 Paul L. Knight (D.C. Bar #911594)
                                                 Emil Hirsch (D.C. Bar #903479)
                                                 O'Connor & Hannan, LLP
                                                 1666 K Street, NW, Suite 500
                                                 Washington, DC  20036
                                                 Telephone:  (202) 887-1400
                                                 Facsimile:  (202) 466-3215

                                                 *Attorneys for Plaintiffs*