# EXHIBIT 9

### Page 169

referred to earlier, after catching the Iranians red-handed at scattering mines that hit a US-flagged vessel, the United States attacked and essentially destroyed an Iranian offshore oil platform, which, it turned out, made us liable for damages under a mutual treaty that we had signed many years earlier and forgotten about. And the Iranians brought a case at the International Court of Justice about this matter, which was really quite embarrassing to the United States. And I think that it wouldn't surprise me in the least if Iran were to regard this as a bargaining chip that the United States could use, you know, "We'll drop that if you drop your ICJ case", in some kind of a global politically-motivated settlement of the mutual claims that the two sides have on each other.

That said, I think that this sort of punitive damages would cause the Iranian Government to think twice about the advisability of targeting American citizens, and it wouldn't surprise me in the least if they were to respond to this in somewhat similar ways they seem to have responded to the Mykonos verdict, which is to change their modus operandi while trying to accomplish the same political goals, without providing the same kind of reaction from the United States again.

So to the extent that we have the very limited purpose of stopping attacks on American citizens, we might well be able to accomplish that through this kind of an

### Page 170

action, without necessarily accomplishing the overall political goal, say, of the United States Government about deterring Iranian terrorism.

THE COURT: But you think that they would not just ignore this as a piece of paper; they would take the assumed threat there that they might have to deal with, that there would be further judgments if they continued to kill other Americans?

THE WITNESS: I think the Iranians are...Iranian leadership is very much, by orientations, sensitive to bargaining techniques and bargaining chips that people can bring to bear, and I think they, especially after the Mykonos verdict, are very well aware of the sanctity with which western leaders regard court judgments, and the importance placed by western societies upon the independence of their court system, and that that Mykonos verdict has made the Iranians intensely aware of how such court judgments can take what previously had been a contentious political issue, and make it something that all people within the country where the judgment was issued will agree that something has to be done about this matter.

THE COURT: So if you were sitting here advising the Court, you would think it's something I should do?

THE WITNESS: If the purpose is to prevent attacks on American citizens. I think we have to decide very

### Page 171

specifically what it is we want to deter, and have a clear concept of what it is that this law and that these punitive damages are designed to do. But if my understanding is correct, and the purpose is to deter attacks on American citizens, then it would seem to me that this is something that could well be accomplished through the kind of punitive damages that are being discussed here. And I say that as someone mostly concerned about US Government policy on Iran, and I'll have to tell you that that would not be sufficient for me, as advising the US Government, to say that therefore Iran's behavior meets the test that we have insisted upon for stopping terrorism, because I think that Iran would be very interested still in targeting Mr. Rushdie. Mr. Rushdie, for instance, primarily lives on Long Island now, but he's not a US national, yet it would be profoundly embarrassing to the United States if Mr. Rushdie were assassinated tomorrow. And yet, nothing that this Court will have done would have any way touched upon the issue of assassinating Mr. Rushdie.

THE COURT: Anything else you want to ask?
MR. FAY: No, Your Honor.
THE COURT: Thank you very much, Dr. Clawsen.
THE WITNESS: Thank you.
(Witness excused.)
MR. FAY: Your Honor, at this time, we call Mr. Harry Brandon.

### Page 172

HARRY B. BRANDON, PLAINTIFF'S WITNESS, SWORN
DIRECT EXAMINATION
BY MR. FAY:
Q. Could you please state your full name and address?
A. Yes. Harry B. Brandon, 1155 15th Street, Northwest, Number 1002, Washington, D.C.
Q. Could you detail your education for us, Mr. Brandon?
A. Yes. I have an undergraduate degree in history from University of New Mexico. I have a master's degree in international relations from the University of Texas.

THE COURT: When did you wise up, leave New Mexico for Texas?
(Laughter.)
THE WITNESS: Well, we had to go over and give them a little bit of liberalism.
(Laughter.)

BY MR. FAY:
Q. Could you detail your professional experience for me?
A. Yes. In 1994 I retired from the FBI after 23 years serving as an FBI agent.
Q. Prior to your retirement, could you give us a survey of your experience in law enforcement?
A. Yes. For the first eight years of my time with the FBI, I worked in general...what we call general criminal matters. At that time I was assigned to our office in Puerto

Page 173

1 Rico, where I began to specialize in counter-terrorism matters
2 in Puerto Rico. I followed that through the rest of my
3 career, and when I retired, I was deputy assistant director in
4 what is now called the National Security Division; at that
5 time was the Intelligence Division. Among my responsibilities
6 was the responsibility for the FBI for the
7 National/International Terrorism/Counter-Terrorism Program.
8 Q. Did that include work with regard to the World Trade
9 bombing, World Trade Center bombing in New York?
10 A. Yes, it did.
11 Q. And since your retirement from the FBI, can you tell us
12 what you've done?
13 A. Yes. I've worked for with an international company,
14 and subsequently, two years ago, I became one of the founding
15 partners of Smith Brandon International. We work around the
16 world, primarily in developing parts of the world, assisting
17 US businesses establish themselves, and also help them in what
18 we would call risk avoidance. It includes counter-terrorism.
19 Q. Mr. Brandon, to what extent has your work in the FBI
20 and since then, required you to acquire a knowledge of Near
21 Eastern terrorist groups, including PIJ, Hamas, the Shaqaqi
22 faction and so forth? And I'll get to those specifically in a
23 moment.
24 A. Certainly. Certainly during my period of service with
25 the FBI in counter-terrorism matters, various Middle Eastern

Page 174

1 groups became of primary importance to the US Government due
2 to the threat posed to US interests abroad, to US interests in
3 the United States. So I've interacted extensively, both
4 within the various parts of the US Government, as well as with
5 probably as many 20 foreign intelligence services, some we
6 call friendly, maybe some not so friendly, but interested in
7 countering terrorism. That's continued since I've left the
8 FBI in terms of private contacts, both with governments as
9 well as with individuals.
10 Q. Has that included the necessity that you learn of the
11 activities of a group called PIJ?
12 A. Yes. I was very familiar with PIJ while I was in the
13 FBI. They were a matter of great concern to the US
14 Government, and I find that they remain a matter of concern.
15 Q. Can you define, when we use that term, PIJ, what does
16 that mean?
17 A. Palestinian Islamic Jihad. It's a group, actually
18 somewhat in some ways somewhat hard to define, in that it
19 appears that people involved with PIJ come in, leave, come
20 back in. It has primarily been involved directly in acts of
21 violence, acts of terrorism, as opposed to some of the other
22 groups who do have, some at least, modified social agendas.
23 Q. And the term Shaqaqi faction, what is that?
24 A. The Shaqaqi faction, to me, identifies a particular
25 part of PIJ that I've always considered to be, and I think

Page 175

1 most people who worked in the area that I worked in, would
2 characterize him as a particularly violent part of PIJ, very
3 closely aligned with terrorism. In fact, that seemed to be
4 their sole function, to carry out acts of terrorism.
5 Q. Mr. Brandon, does the work of the FBI include acquiring
6 knowledge and doing, in conjunction with other services,
7 investigations as to Americans who are injured overseas or die
8 overseas as a result of terrorist activities?
9 A. Yes, it does. There are US statutes that give the FBI
10 jurisdiction when American institutions or individuals are
11 injured or killed or attacked overseas. So the FBI has been
12 very active abroad for the last 10 years.
13 Q. Just so the Court and all of us know, can you, in the
14 last 10 years, give us an overview of the scope of these
15 terrorist activities by groups like PIJ, like the Shaqaqi
16 faction, and so forth?
17 A. In any given year there have been 300 to 400 acts of
18 violence directed against US interests abroad. That number
19 has been...it goes up and down some, but I think it's fairly
20 consistent. With regard to PIJ, specifically, or the Shaqaqi
21 faction, in reality, most of their acts of violence have been
22 limited to Israel or parts of Jordan in which they disputed
23 Israeli occupancy. So the acts directed against US interests
24 have not been great. They have, upon occasion, been fatal,
25 but there have not been a number of acts directed against US

Page 176

1 interest.
2 Q. In your investigation and in your scope of knowledge
3 about the Shaqaqi faction, would you concur in the opinion
4 expressed earlier by videotape here of Dr. Paz, that the
5 virtually sole support of the Shaqaqi faction is the Iranian
6 Government?
7 A. Yes, I do. I agree with that.
8 Q. In the intelligence/security community, to what extent
9 is that recognized by persons other than yourself and Dr. Paz;
10 in other words, how wide is that recognition?
11 A. I think that that opinion is very consistent throughout
12 the US and other intelligence communities around the world
13 that are concerned about the activities of Middle Eastern
14 extremist groups.
15 Q. There was an indication too by Dr. Paz that the Shaqaqi
16 faction had admitted responsibility for that. Are you aware
17 of what went on with regard to the bombing at Kfar Darom and
18 admissions made by the Shaqaqi faction?
19 A. Yes. It's my understanding that there were public
20 claims...or there was a public claim by individuals, saying
21 that they were from the Shaqaqi faction, claiming credit for
22 this action. The action was consistent with other acts that
23 they've been identified with.
24 Q. Mr. Brandon, would your expertise include the ability
25 to render an opinion with regard to the funds spent by the

Page 177

1 government of Iran in the support of terrorism?
2 A. Yes. Primarily based upon my association with US and
3 foreign intelligence services, funding is a matter under
4 discussion and review. I am familiar with that.
5 Q. And would that include all sources, including public
6 sources as well as other sources of information?
7 A. Yes, both public and sensitive governmental sources.
8 Q. And would your expertise include knowledge as to what
9 would reasonably be required to deter terrorism directed
10 against American citizens in the future?
11 A. It does. This is always a matter of opinion.
12 Q. I understand.
13     Your Honor, we would ask that Mr. Brandon be
14 qualified as an expert and allowed to express an opinion with
15 regard to these subjects.
16     THE COURT: How long were you head of counter-
17 terrorism for the FBI?
18     THE WITNESS: I was head of counter-terrorism for my
19 last two years at the FBI.
20     THE COURT: And how long were you in the
21 Intelligence Division?
22     THE WITNESS: In and out, you go out to the field
23 and back in, 12 years.
24     THE COURT: How much of that was at headquarters?
25     THE WITNESS: Well, the 12 years was headquarters

Page 178

1 time.
2     THE COURT: Headquarters time, right.
3     THE WITNESS: I did escape out to the field
4 occasionally.
5     THE COURT: Where did you escape to in the field?
6     THE WITNESS: I served in Norfolk, Virginia, in
7 Hartford, Connecticut and Madison, Wisconsin, and I had two
8 tours in Puerto Rico.
9     THE COURT: And you made your original reputation,
10 from what I heard, in Puerto Rico anyway, I take it, right?
11     THE WITNESS: Yes, sir.
12     THE COURT: In counter-terrorism type
13 investigations?
14     THE WITNESS: Yes, sir.
15     THE COURT: You can proceed.
16 BY MR. FAY:
17 Q. Mr. Brandon, could you first cover what the sources are
18 within your knowledge, without disclosing anything that's
19 within national security or should not be told in public, what
20 the sources are within your knowledge, for giving an opinion
21 as to the amount of money spent by Iran, particularly in the
22 1995 period for terrorism each year?
23 A. Professionally, various agencies of the US Government
24 and other governments are involved in evaluating and tracking
25 sources of funding. This includes speaking with live sources.

Page 179

1 It includes what I would call other sensitive sources. It
2 includes detailed analysis of the movement of money around the
3 world, and it also includes very careful evaluation of
4 statements by the government involved, in this case the
5 government of Iran, and statements by their leaders, public
6 source information.
7 Q. And based upon all of those sources, are you able to
8 give us an estimate, within a reasonable degree of certainty,
9 as to the amount spent, especially directed to 1985 (sic),
10 spent upon terrorism by the government of Iran?
11 A. Specifics are difficult. My estimate would be in the
12 neighborhood of $100 million per year, supporting various
13 terrorist movements.
14 Q. Mr. Brandon, would you consider...can you tell us
15 whether you would consider Iran to be the prime state sponsor
16 of terrorism during this period, 1995?
17 A. Absolutely.
18 Q. Can you give us a little idea, based upon all your work
19 in the FBI, as to how this operated with regard to the Shaqaqi
20 faction?
21 A. Yes. The Shaqaqi faction had very defined and
22 identified close ties with the government of Iran. It was
23 even somewhat noteworthy in that they're primarily Sunni, with
24 close ties to a Shia Government, very unusual, but it appeared
25 to go to political philosophy. That was the opinion of most

Page 180

1 of the experts at the time, that the leaders of the Shaqaqi
2 faction were philosophically aligned with the politics of
3 Iran. That was what I would characterize as a "take no
4 prisoners approach", direct, open use of terrorism as state
5 policy, and the Shaqaqi faction was an arm of that. The
6 government of Iran supported them directly, as they did
7 others, including Hezbollah, their nearby neighbors, supported
8 them in terms of training, supported them in terms of
9 equipment, and certainly in terms of money.
10 Q. Now, you were present, of course, when Mr. Clawsen
11 testified with regard to deterrence of these things, different
12 types of terrorism through punitive damages. Can you tell us
13 whether in your experience in the FBI, looking at it from the
14 law enforcement side and the rise and fall of these incidents,
15 whether his opinion would be supported by your experience in
16 the FBI?
17 A. Yes, it would. We have very little experience in
18 deterring governments, or deterring organizations from
19 terrorism. We do have a lot of experience though, I might
20 say...if you can draw the parallel...in looking at various
21 criminal groups, organized groups for maybe somewhat similar
22 purposes. And quite often we find when you start taking away
23 resources and money, it modifies behavior rather rapidly. I
24 think that's a very effective tool. I think exactly the same
25 thing would apply to a government.

**Page 181**

1 Q. Let me ask you whether you, in your opinion, can draw a
2 parallel with any domestic law-breaking, such as the various
3 seizure statutes of property regarding drug movement in the
4 United States?
5 A. Yes. I think that has been effective. We haven't
6 stopped the inflow of drugs, but where we have made an impact,
7 in my opinion, is when we've been able to take property, when
8 we've been able to take various other physical resources, and
9 certainly when we've attacked bank accounts, and where we've
10 been able to identify and take money. I think that's been
11 very, very effective, and the statistics show that.
12 Q. Did you have an opportunity to examine the list
13 provided by Dr. Paz of conduits for Iranian funds to terrorist
14 groups including --
15     MR. PERLES: Your Honor, excuse me. May I consult
16 with Mr. Fay for a moment?
17     THE COURT: Sure.
18     (Pause.)
19     MR. PERLES: Thank you, Your Honor.
20 BY MR. FAY:
21 Q. I'm not asking you now to recount the exact route
22 and...routes and bank accounts. Those are before the Court,
23 and the exhibit is sealed, and I should have said that before
24 I started the question.
25     But with regard to the information given on that

**Page 182**

1 sheet, can you tell us whether you would concur with Dr. Paz's
2 opinion that these are reasonably the routes used by the
3 Iranians in order to fund terrorist activities?
4 A. Yes, I do. I would say that those are certainly among
5 the routes. They're probably not limited to that.
6 Q. In investigating terrorist activities, do routes such
7 as these come to light in the course of investigations, sort
8 of as the footprints of terrorism?
9 A. Yes. They're tracked very carefully. You look for
10 this as indications of movement of resources. You also look
11 at it sometimes as predictors of acts of terrorism. Very
12 important.
13 Q. Further, to give the Court some idea of the scope of
14 terrorism, how many Americans have been killed or injured in
15 terrorist attacks over the years? Can you give us some idea
16 of the scope of this problem? I should add that the Court
17 does have, as an exhibit, the Department of State report
18 published in April 1996, regarding terrorism during 1995.
19 A. You've just about stopped me cold. I used to know
20 those numbers.
21 Q. Okay. You're familiar with the publication that I've
22 just alluded to?
23 A. Yes, I am.
24 Q. Again, without disclosing any confidential sources, can
25 you tell me how accurate the information is in those yearly

**Page 183**

1 reports, based upon your experience as an official of the FBI
2 and your experience since?
3 A. It...I consider the information in there to be
4 extremely accurate. It is discussed. It is analyzed very
5 carefully before it's published, even argued over sometimes
6 before it's published. It's very accurate.
7 Q. I take it these reports --
8     THE COURT: Let me ask something there, because I
9 have seen these before. I take it these reports like this
10 one, that the plaintiffs have given me, are used within the
11 Intelligence Division there, the National Security Division
12 even, in preparing background memos and things like that,
13 right?
14     THE WITNESS: Yes, sir. Yes, sir. They're referred
15 to --
16     THE COURT: Because they're really used as the
17 official position on a lot of these kinds of foreign
18 governments, right?
19     THE WITNESS: When that report comes out, it is by
20 consensus among the intelligence community that things stated
21 in there become the position.
22     THE COURT: Of the US intelligence community then?
23     THE WITNESS: Yes, sir. Yes, sir.
24     THE COURT: And the FBI agrees with the assessment
25 that's gone into this then?

**Page 184**

1     THE WITNESS: Yes, sir.
2 BY MR. FAY:
3 Q. I recognize it was not entirely within your expertise,
4 but when Mr. Clawsen was here and gave multiples with regard
5 to the amounts spent as a suggested level which would deter
6 terrorism, in your experience in the FBI now, did that...those
7 figures appear to be reasonable in terms of deterrence of
8 potential terrorists?
9 A. Yes, I think so. Maybe, if I might say, not only FBI,
10 but also as a bureaucrat very much involved in various budgets
11 at the time, when you take away resources, something has to
12 give. And the government...and governments, regardless of
13 where they are, would be no different. So when you take away
14 resources, something has to give, and I think they have to
15 think about why they've lost resources and what the impact is.
16 Q. In your preparation here, did you also review the
17 statements by the Shaqaqi faction that they in fact did carry
18 out this attack at Kfar Darom?
19 A. Yes, I did.
20 Q. In your experience in the FBI and in this area, in
21 counter-terrorism, do you see any reason to doubt the accuracy
22 of their admissions that they carried out these attacks?
23 A. No, I don't.
24     THE COURT: Why would a group like that want to
25 claim credit?

**Page 185**

1  THE WITNESS: It gives them credibility within...in
2  this case, within the Palestinian community.
3      THE COURT: So they want to boast about it?
4      THE WITNESS: Absolutely, yes, sir.
5      THE COURT: That they're the ones that set off the
6  bomb?
7      THE WITNESS: Yes, sir.
8      THE COURT: And that's actually credible that
9  they're doing that?
10     THE WITNESS: Yes, sir.
11     THE COURT: That's the way you gain credibility in
12  the Palestinian community?
13     THE WITNESS: Yes, sir. That's the way you do that,
14  and build support. That's the way you get recruits, yes, sir.
15     THE COURT: It's counter-intuitive to the normal
16  criminal element we see in this country, right?
17     THE WITNESS: It is. It absolutely is. But it
18  happens rather frequently.
19  BY MR. FAY:
20  Q. And would you, finally, have an opinion with regard to
21  the testimony that's gone forward so far about Iranian support
22  for the Shaqaqi faction and the extent of it? Will you have
23  an opinion in that area as well, within a reasonable degree of
24  certainty?
25  A. Yes. Everything that I know and that I've seen leads

**Page 186**

1  me to say that, without qualification, that the government of
2  Iran directly supports PIJ and directly supports the Shaqaqi
3  faction, both philosophically and in terms of resources and
4  training.
5      THE COURT: And did so in 1995?
6      THE WITNESS: Yes, sir.
7  BY MR. FAY:
8  Q. Now, PIJ, again, is the Palestinian --
9  A. Palestinian Islamic Jihad.
10  Q. And the Shaqaqi faction was headed up by Mr. Shaqaqi?
11  A. Yes. He was killed.
12  Q. We've alluded to --
13     THE COURT: He was killed later in '95; is that
14  right?
15     THE WITNESS: Yes, sir. I believe it was October or
16  November of '95.
17  BY MR. FAY:
18  Q. I presume you were not present when he was --
19  A. No, sir.
20  Q. -- made his departure. And I presume it was not from
21  natural causes?
22  A. No.
23     (Laughter.)
24     MR. FAY: Your Honor, indulge me just a moment.
25     (Pause.)

**Page 187**

1  BY MR. FAY:
2  Q. We have one other area. Let me ask you about the
3  individual defendants in this case, and let me go one by one,
4  and perhaps you could explain what is known with regard to the
5  Iranian structure and their position within it.
6      First of all, the Iranian Ministry of Information
7  and Security; can you tell me a little bit about that, where
8  it fits into the Iranian hierarchy?
9  A. The information, in my opinion, is a bit of a misnomer.
10  It's primarily used as an internal and external security and
11  intelligence service. They run things very closely inside
12  Iran, and they have responsibility for external actions in
13  carrying out external actions. That includes working with,
14  training, and liaison with not only their agents abroad, but
15  people who represent them abroad, various terrorist groups.
16  And they state this publicly.
17  Q. It would be the equivalent in the old Soviet regime,
18  where the KGB would function both within the government
19  and...within the country and outside the country?
20  A. Yes. In fact, there's a very direct parallel.
21  Q. Now, what about...I'd like to ask you about the
22  Ayatollah Ali Hoseini Khamenei. And, again, I've probably
23  fractured the name, but where in 1995 did he fit in this
24  hierarchy in Iran?
25  A. Well, in a Shia country, he would be the ultimate

**Page 188**

1  decision-maker. One of the aspects of the Shia branch of the
2  religion is that much more importance and deference is given
3  to religious leaders in terms of decision-making, and in fact,
4  most decisions are deferred to religious leaders. And the
5  more important you are, the higher you rank, if you will,
6  within the structure, the more decisions flow uphill. And the
7  Sunni side, there's a...I don't know whether "democratic" is
8  right, but there's more consensus building. There's more
9  input by other people. In the Shia side, in fact, decision-
10  making is made by the religious leaders. He was the supreme
11  religious leader in Iran. He would be the ultimate decision
12  maker.
13  Q. In a decision of this magnitude...by "this magnitude" I
14  don't mean specifically aimed at the bombing at Kfar Darom,
15  but the decision to engage in a series of terrorist acts
16  within the State of Israel...would this, of necessity, have to
17  be cleared by Mr. Khamenei?
18  A. Yes. In my opinion, absolutely. He would have to
19  approve, and in fact, did approve, the use of agents of Iran,
20  and that would mean terrorist groups or individuals, in
21  carrying out acts which they viewed to be on behalf of the
22  revolution. Absolutely, without question, he approved this.
23  Q. Let me next take up Ali Akbar Hashemi-Rafsanjani. Can
24  you tell me where he fit within this hierarchy?
25  A. Yes. Subservient to the Ayatollah in opinions, maybe

Page 189

1 representing the public, if you will; was a member of the
2 inner council, was very much a part of the decision making,
3 would more than likely be the person that would bring
4 recommendations forward to the Ayatollah Khamenei for the
5 ultimate decision.
6 Q. And, finally, Ali Fallahian-Khuzestani, and again, I
7 know I fractured the name, but I'm sure you know who it is.
8 A. I believe he was the head of the service. As head of
9 the service...even if he's not a religious leader, they're
10 very hierarchical...he would take forward recommendations,
11 would make the decisions, he would go forward to Rafsanjani or
12 to various councils that would meet to make policy decisions.
13 There's no question the use of terrorism outside of Iran was a
14 policy decision. They publicly stated that and continue to do
15 so today, that it's a valid, legitimate arm of furthering the
16 Islamic revolution. So he would make the decisions, come
17 forward with plans, move them up the chain.
18 Q. In other words, if this were a run of the mill criminal
19 or civil case here, it would be a declaration against penal
20 interest and --
21 A. That's right. I don't think they're too worried about
22 that.
23 Q. I always like to get back to...I don't want to forget
24 where I'm from.
25 　(Laughter.)

Page 190

1 　MR. FAY: Thank you. I have no other questions of
2 Mr. Brandon, subject, of course, to any questions, further
3 questions from the Court.
4 　THE COURT: Thank you very much, Mr. Brandon.
5 　THE WITNESS: Thank you.
6 　(Witness excused.)
7 　THE COURT: Off the record for just a moment.
8 　(Off the record discussion.)
9 　MR. FAY: Your Honor, there are a number of exhibits
10 that we have presented to the Court. We would ask that all of
11 them be admitted into evidence. We have not gone into most of
12 them in depth, but let me just review for a moment here some
13 of the things that we would consider to be highlights of them.
14 　With regard to the records from Brandeis University,
15 they, of course, support the testimony Dr. Sarna. But in
16 addition, I would call Your Honor's attention to the
17 application to Brandeis, which is very interesting in terms of
18 the amount of volunteer work done by Alisa Flatow, and her
19 essay concerning teaching kids coming to the United States to
20 play baseball. I think it gives a real idea of the value of
21 the person that we're concerned with here, and I recognize
22 these are things that Your Honor's going to have to go over
23 after we're through here, but it's extremely interesting in
24 terms of the sensitivity shown by Alisa with regard to kids.
25 Certainly you don't get many people, male or female,

Page 191

1 functioning on this intellectual level, who reach out so much
2 to children who, of necessity, are not going to be functioning
3 on the same intellectual level as she has.
4 　And I would point out too, of course, that the
5 academic record well supports the testimony of Professor
6 Sarna, and the assumptions made by Dr. Paige with regard to
7 his economic report.
8 　With regard to Exhibit Number 2, this is the
9 affidavit of Mr. Flatow that simply reviews the entire
10 situation.
11 　Now, in the records, Number 3, which are the medical
12 records from the Soroka Medical Center, we've had those
13 translated, and the hand-printed are not of course a
14 translation and not the original records. The original
15 records pretty much follow the form that I'm sure Your Honor
16 is familiar with, we see all of the time here. It looks as
17 though a lot of them are actually the same kind of forms as we
18 might get from Sibley Hospital or someplace here, with just
19 some notations in Hebrew. However --
20 　THE COURT: They're just in words that I can't read.
21 　MR. FAY: Yes, but I would --
22 　THE COURT: Otherwise...and I can't read the ones
23 from Sibley either, so it really doesn't matter.
24 　(Laughter.)
25 　THE COURT: I have to have somebody translate those

Page 192

1 too.
2 　MR. FAY: I've often said this to Dr. Ammerman, and
3 he said, no, that his handwriting is perfectly clear, but I
4 have my doubts.
5 　(laughter.)
6 　MR. FAY: In those forms though, written in English
7 is the statement from Mr. Flatow, in which he...which was
8 alluded to by Dr. Fischer in his testimony, in which he gives
9 permission for the organ donation. And that is important too
10 because it indicates the depth of feeling and the purpose of
11 that. And I would call again to the Court's attention the
12 testimony of Dr. Fischer with regard to how unusual this was
13 in Israel at that time. This was an unusual move, and it did
14 save the lives of several people.
15 　We have, although in terms of the other damages in
16 this case, it's a distinctly minor item. We also have
17 presented the funeral bill. I haven't had any testimony on
18 that, because when...the total sum of the damages, that's a
19 small part, but we've included that as well.
20 　We have also included, of course, the economic
21 report of Dr. Paige, which he testified to, as well as his CV.
22 That CV is Number 7.
23 　Number 8 is the CV of Dr. Clawsen, which is...it is
24 very modest in view of all the publications in his background.
25 　Number 9 is the Report of Death of American Citizen