# EXHIBIT 12

Case 1:06-cv-00711-PLF    Document 16-14    Filed 12/07/2007    Page 1 of 13

EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF SIAVASH BAYANI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, et al., <br><br> Defendants. | Civil Action 04-01712 (HHK) |

MEMORANDUM

This action is brought pursuant to the "terrorism exception" to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1605(a)(7), and arises from the detention, torture, and execution of Siavash Bayani, a naturalized American citizen, in 1997. Plaintiffs are Fatemeh Bayani, Siavash's widow and the executor of his estate who brings this action on behalf of the estate and on her own behalf, and their children, Banafsheh Bayani and Babak Bayani. Defendants are the Islamic Republic of Iran, the Iranian Ministry of Information and Security, the Iranian Revolutionary Guard Corps, Ali Akbar Hashemi Rafsanjani, Ali Akbar Fallahian Khuzestani, and Ayatollah Ali Khamenei.

The default of defendants was entered on February 4, 2005. On July 9-11, 2007, this court conducted a bench trial to receive evidence regarding plaintiffs' claims. Based on the evidence presented at the trial and the record of this case, the court makes the following findings of fact:

## I. FINDINGS OF FACT

A.     BACKGROUND

1. Siavash Bayani and Fatemeh Bayani were born and married in Tehran, and subsequently had two children, Banafsheh and Babak Bayani, who were born respectively on May 3, 1968 and August 26, 1974. Siavash was born on August 1, 1937, and Fatemeh was born on November 24, 1945.

2. When Siavash and Fatemeh began their life together, Iran was a monarchy headed by Mohammed Reza Pahlavi, the Shah of Iran.

3. After completing his studies in Iran and the United States, Siavash became an officer in the Iranian Air Force. He was a radar operator and was stationed at the Central Radar base in Tehran for fourteen years.

4. In 1977, he was sent to the United Sates as a Liaison Officer, where he supervised Iranian students studying at the Oceana Naval Air Station in Virginia Beach, Virginia. His wife and two minor children accompanied him, and they were in the United States in 1979 when the Islamic Revolution ousted the Shah's regime and a new government for Iran was established.

5. When Siavash returned to Iran in 1979, he was able to keep his military rank, but under the new government he had far less authority and his duties consisted primarily of training and teaching.

6. Soon after the Iran-Iraq War in 1981, the Iranian government began purging the military of those officers who had served under the Shah's government. Soldiers of the Iranian Revolutionary Guard Corps, under the direction of the Ministry of Intelligence and Security, began rounding up and executing the top military officers who had served under the Shah's

2

regime.

7. Many officers were summarily arrested and executed systematically based on their rank.

8. In 1984, fearing that his arrest and execution were imminent, Siavash and his family left Iran, ostensibly to seek medical treatment for Babak in the United States, and they subsequently applied for and were granted asylum.

9. The family lived briefly in Philadelphia and later moved to Los Angeles, California, where Siavash worked as a maintenance repairman at a local Holiday Inn.

10. Thereafter, sometime in 1990, he was hired by the Litton Corporation, where he worked in the replacement parts department.

11. In 1994, Siavash's mother became gravely ill and was in dire need of immediate medical care for leukemia.

12. Because the Iranian government at this time was promoting and encouraging the return of expatriates, Siavash made inquiries of old colleagues and friends in Iran to determine whether it would be safe for him to return to Iran to attend to his ailing mother.

13. On October 20, 1994, Siavash and Fatemeh became naturalized United States citizens.

### B. EVENTS LEADING TO THE DETENTION, TORTURE, AND EXECUTION OF SIAVASH BAYANI

14. In early 1995, Siavash received a letter from a friend he had contacted in Iran informing him that the Iranian government was giving amnesty to all those who served in the military under the Shah's regime. The friend assured Siavash that he could safely return, without fear of government reprisals, and reclaim his home that had been confiscated by the Iranian

government in his absence.

15. Siavash and Fatemeh returned to Iran on February 2, 1995. Upon arriving in Iran, Siavash and Fatemeh, both of whom carried United States and Iranian passports, informed government officials that they were United States citizens and displayed their passports.

16. After a lengthy inspection and interview, Fatemeh's passports were returned to her and she was permitted to travel without restrictions. Siavash's passports and all of his other identification documents, however, were confiscated and he was advised that he was subject to a routine secondary inspection. He was asked to provide an address where he could be contacted while in Iran, but he was not told when or how he could retrieve his passports.

17. While taking care of his terminally ill mother, Siavash began contacting friends and old colleagues in an attempt to find employment in Iran. He was told repeatedly by potential employers that it would be dangerous for them to hire him, given his connections to the Shah's regime and the United States. Moreover, he was warned that he was not safe and that he should return to the United States as soon as possible.

18. One day, after being in Iran a little more than five months, Siavash returned from a job interview and told his wife to return to the United States immediately. He did not give a detailed explanation but informed her that it was now very dangerous for them to remain in Iran.

19. On July 17, 1995, Fatemeh boarded an Alitalia flight to the United States.

20. Less than twenty-four hours later, on July 18, 1995, Siavash was arrested and imprisoned at Evin prison.

21. Some parts of the Evin prison complex provide pleasant housing for public display, and other parts are used to hold political prisoners in solitary confinement where they are

tortured.

22. For more than a year, Siavash was not allowed to contact his family. Finally, in August 1996, he was allowed to contact his family by telephone. He was surrounded by guards and spoke in code words. During the eight to ten minute conversation, he indicated that he had been arrested and tortured and that it was not safe for his wife to return to Iran. The conversation ended when the phone was taken away by an apparent interrogator who told Fatemeh that there were a few issues that needed to be cleared up, that the issues could be taken care of, and that her husband would be released if she returned to Iran.

23. After the telephone call, five or six months later, Siavash was allowed to write letters to his family. These letters contained coded messages indicating that he was being tortured and denied food. Other evidence of torture of Siavash includes the following observations of Siavash by family members who visited him in prison:

- Talat Shadpayam, Siavash's mother-in-law, testified that Siavash had been beaten so badly that he could not walk upright. Because of the whippings he had endured, his head and neck were deformed and he had changed so much that "he had become a new being." (Trial Tr. 153, July 10, 2007).

- His maternal cousin, Mahin Rassadi, visited him at Setad Dozor, a meeting location designated for individuals incarcerated at the Evin Prison. (Trial Tr. 125, July 9, 2007, citing Rassadi Dep. 30:19-30:25, Jan. 26, 2006). Rassadi testified that Siavash said that he was being tortured regularly. He told her, "[t]hey are beating me up the whole time, and they asked me to confess," and that he was "accused of spying the whole time, and that he frequently was asked to confess that

he was a spy." (*Id.* at 133).

24. A few months after the telephone call, government officials contacted Siavash's mother and offered to help gain his release in exchange for large sums of money in U.S. dollars.

25. Out of desperation, Siavash's mother and Fatemeh began paying money to these officials.

26. Fatemeh collected the family's life savings, withdrew the maximum amounts from their credit cards, and took out loans from friends and relatives. These efforts yielded $95,000.00 which she sent to Siavash's mother so that she could pay government officials to gain access to Siavash.

27. About four months after his first telephone call, Siavash's mother was allowed to visit him. He had lost nearly half his normal weight, and his body was covered in bruises.

28. Siavash continued to write letters to Fatemeh. He repeatedly expressed his frustration at being imprisoned for so long and, in a letter dated July 28, 1997, he expressed his desire to "keep trying to the last moment to prove my innocence." (Pl.'s Ex. 9, Subex. 10).

29. Unfortunately, he would never have the chance prove his innocence. A few months later, Siavash's mother-in-law received a phone call from an Iranian government official, notifying her that Siavash had been hung by the neck until dead. The execution took place only hours after Siavash's mother had died.

30. Eleven days later, the official Iranian government newspaper, Salam, reported that Siavash was executed as a spy for the "Great Satan," the United States, and that he had worked as an agent for the U.S. Central Intelligence Agency. (Pl.'s Ex. 10).

31. Siavash, in fact, was never employed by the Central Intelligence Agency or any other

6

U.S. government agency and never received money from the U.S. government for information about the Islamic regime in Iran or for any other services.

### C. THE OFFICIAL GOVERNMENT OF IRAN AND THE "PARALLEL" REVOLUTIONARY STRUCTURE

32. Dr. Patrick Clawson, deputy director for research of the Washington Institute for Near East Policy, testified about how the Iranian Government developed after the Islamic Revolution, its current governmental structures, and the hierarchy of executive, legislative, and judicial power within these structures. Dr. Clawson has authored more than twenty-four books and seventy articles about the Middle East, has testified before congressional committees more than twenty times, and has been an expert witness in more than a dozen federal cases.

33. The 1979 revolution in Iran was a popular revolution that gave rise to a "contradictory" government structure. (Trial Tr. 21, July 10, 2007). The formal governmental structure consists of, inter alia, a president, a cabinet, ministers, parliament, a military, and courts.

34. Parallel to this structure is a revolutionary structure, with parallel components, headed by the Supreme Leader, Ayatollah Ali Khamenei, and a council, comprised of Islamic clerics, personally chosen by him. For example, parallel to the regular military is the Islamic Revolutionary Guard Corps and parallel to the regular courts are revolutionary courts.

35. In each instance, the revolutionary institution is more powerful than its formal governmental counterpart.

36. Despite his lack of an "official" position in the government, the Supreme Leader holds absolute power over the formal government structure. "That, indeed, is what the constitution provides . . . the Supreme Leader has the authority to dismiss the president, to

overrule the Parliament and the courts and to overrule any law," even religious law. (*Id.* at 22).

37. The government of Iran operates under "the rule by the jurisprudent." (*Id.* at 21). This theological term means that the Supreme Leader "is acting as the representative here on earth for the hidden Imam, who will return one day at the end of days. And in his absence this representative . . . has the authority to make any decision whatsoever." (*Id.* at 22).

### D.     TRIAL BY REVOLUTIONARY COURT

38. The persons who arrested, detained, and eventually executed Siavash, were acting on orders and under the authority of entities belonging to the revolutionary governmental structure. The notice of Siavash's death, published in the official Iranian newspaper Salam, announced that he had been arrested and detained by "unknown soldiers of Imam Zaman." (Pl.'s Ex. 10). Dr. Clawson explained that this was a name used by an organization of the "parallel structures," which is likely "under the control of the [Iranian Revolutionary Guard Corps]" or similar elements of the structure, and which is responsible for "detention and punishment." (*Id.* at 30).

39. Siavash was eventually brought before the Revolutionary Court, which is a parallel system to the regularly constituted Iranian court system, and which offers an accused little, if any, opportunity to defend himself.

40. Dr. Clawson described the two legal systems in Iran as follows:

> There is a peculiar legal situation that parallel to the ordinary courts, which are used for many less publicized criminal cases, there then exist an entirely separate system, which seems to function more or less without procedures, and on an ad hoc basis, which operates its own parallel system of judgment and punishment.

(*Id.* at 24-25).

41. Dr. Clawson further explained that the individuals who sit as judges on these Revolutionary Courts often have no formal legal training and some "do not even meet the

minimal standards . . . that Islamic traditional law sets down for being judges." (*Id.* at 33).

42. There is little, if any, "due process" provided to an accused by the Revolutionary Courts. Dr. Clawson explained that:

> There are many credible reports that the accused first learn of the charges when they are brought before the court. And that the - that they are given limited, if no opportunity, to defend themselves and that the trials are a summary, lasting minutes.

(*Id.* at 33).

43. Siavash was not provided with legal representation and the requests by his family members to hire their own attorney to represent him were refused.

### E. PLAINTIFFS' INJURIES AND DAMAGES

44. The economic loss to the estate of Siavash Bayani resulting from his execution is between $351,992 to $431,550.

45. Each plaintiff was devastated by Siavash's detention, torture, and execution. Their psychological turmoil was increased by certain unusual aspects of the treatment of Siavash even after his death.

46. Siavash was refused a proper burial. Only after numerous Iranian officials were bribed with large sums of money were male members of Siavash's family permitted to retrieve his corpse so that his remains could be buried rather than dumped and left unburied in a mass grave site known as "the dooms-land." (*Id.* at 36).

*Fatemeh Bayani*

47. Fatemeh was completely devastated by her husband's detention, torture, and eventual execution. She suffers from post traumatic stress disorder. She continues to exhibit symptoms of depression, anxiety, and nightmares. She and Siavash had been married for over thirty-four

9

years at the time he was executed. She lost, and continues to perceive the loss, of her protector and soul mate.

48. Fatemeh spent the family's entire savings in an attempt to gain Siavash's release and is now financially dependent. She receives support from her daughter and for a short period of time was on public assistance, a circumstance that was humiliating to her.

***Banafsheh Bayani***

49. Banafsheh suffers from post traumatic stress disorder and is in need of psychiatric treatment. She was 27 years old at the time of her father's detention and was so emotionally traumatized by his torture and execution that she broke off her engagement to be married. She also isolated herself from the Iranian community and culture.

50. For two years she lived in constant fear that her father would not survive his ordeal. Thoughts of her father's whereabouts and his condition filled her days and nights. She remains haunted by the memories of her father's detention and execution.

51. Banafsheh became the sole breadwinner of the family and was required to take on the responsibility for the financial and emotional support of her mother and younger brother.

***Babak Bayani***

52. Babak was 21 years old when he learned that his father had been detained. He suffers from post traumatic stress disorder and is in need of psychiatric treatment. For Babak, the primary symptoms of the psychological trauma resulting from his father's detention, torture, and execution are: an inability to concentrate and an inability to fall asleep.

53. Babak suffers from a sense of a foreshortened future. Persons who suffer from this symptom "think they're going to die sooner, they're not going to be married, they're not going to

10

have any children. They're never going to be able to hold a good job or ever be happy again." (*Id.* at 127).

## II. CONCLUSIONS OF LAW

1. The Islamic Republic of Iran has been designated a state sponsor of terrorism pursuant to the Export Administration Act of 1979, 50 U.S.C. App. §2405(j).

2. This court therefore has subject matter jurisdiction of this action pursuant to the "terrorism exception" to FSIA. 28 U.S.C. §1605(a)(7).

3. Plaintiffs have established that they are entitled to recover under federal common law and causes of action recognized by the state of California for assault, battery, false imprisonment, and intentional infliction of emotional distress.

4. These causes of action arise from the extrajudicial detention, torture, and execution of Siavash Bayani by the Islamic Republic of Iran.

5. While it appears that Siavash Bayani was tried by an Iranian Revolutionary Court, his execution was not "a deliberate killing . . . authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees *which are recognized as indispensable by civilized peoples.*" 28 U.S.C. § 1350 note sec. 3(a) (emphasis added).

6. While plaintiffs seek judgements against Ali Akbar Hashemi Rafsanjani, Ali Akbar Fallahian Khuzestani, and Ayatollah Ali Khameni, they do not provide any evidence or cognizable theory to warrant or support the imposition of liability on these defendants.

7. Plaintiffs are entitled to judgment in the following amounts against the Islamic Republic of Iran, the Iranian Ministry of Information and the Iranian Revolutionary Guard Corp:

Estate of Siavash Bayani    $22,331,500

| | |
|---|---|
| Fatemeh Bayani | $30,000,000 |
| Banafsheh Bayani | $7,000,000 |
| Babak Bayani | $7,000,000 |

8. Punitive damages shall be assessed against the Iranian Revolutionary Guard Corp in the amount of $400,000,000.

An appropriate order accompanies this memorandum.

Henry H. Kennedy, Jr.<br>United States District Judge

Dated: November 19, 2007