**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LAWRENCE BELKIN, INDIVIDUALLY AND AS
NEXT OF KIN OF GAIL BELKIN,

Plaintiff,

v.

Civil Action No. 06-0711 (PLF)

ISLAMIC REPUBLIC OF IRAN, *et al.,*

Defendants.

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW IN SUPPORT OF**
**RENEWED MOTION FOR DEFAULT JUDGMENT**

Plaintiff Lawrence Belkin, individually and as next of kin of Gail Belkin, by and through undersigned counsel, hereby submits the following proposed findings of fact and conclusions of law based on the sworn affidavits, exhibits, and other evidence submitted to the Court in this matter in support of the entry of a default judgment in this action. This case arises from the 1996 extrajudicial killing of Plaintiff's wife in Israel as the result of a suicide bombing sponsored by Defendants and carried out the Palestinian Islamic Jihad.

## I.  INTRODUCTION AND PROCEDURAL HISTORY

1.  On April 20, 2006, Plaintiff filed his Complaint in this Court seeking, *inter alia,* compensation for his emotional distress and loss of accretions due to the wrongful death of his wife Gail Belkin.

2.  In accordance with 28 U.S.C. § 1608(a) and 22 C.F.R. § 93.2, Plaintiff caused the Complaint, Summons and Notice of Suit, along with translations of each, to be served on each Defendant, namely the Islamic Republic of Iran ("Iran"), Iran's Ministry of Information and Security ("MOIS"), and the Islamic Revolutionary Guard Corp of Iran ("IRGC").

3.      Service of process was initially attempted on each Defendant in Tehran, Iran via DHL pursuant to 28 U.S.C. § 1608(a)(3) on July 6, 2006 and on August 18, 2006.  The DHL packages were refused on August 26, 2006, and the return receipt was returned unexecuted on August 28, 2006.  Docket Entry No. 5.

4.      At Plaintiff's request, the Summonses were reissued on November 1, 2006, and on December 12, 2006 only as to Iran and MOIS, whereupon the Clerk of the Court was requested to assist with service of process under 28 U.S.C. § 1608(a)(4).  Docket Entry No. 8.

5.      Service of process was further attempted via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) on Iran and MOIS.  On December 11, 2006, Plaintiff made a request to the Clerk of the Court by letter.  The Clerk of the Court transmitted the service documents to the State Department on January 25, 2007.  Docket Entry No. 9.  The documents were transmitted to Iran's Ministry of Foreign Affairs via the Embassy of Switzerland on April 22, 2007 under cover of diplomatic notes, numbers 1069-IE and 1070-IE.  The Iranian Ministry of Foreign Affairs returned the documents after being served, but service was effective as of April 22, 2007 per 28 U.S.C. § 1608(c)(1).  *See* Docket Entry No. 10; *see also* Plaintiff's Exhibit 1.[1]

6.      Defendants' Answer was due on June 21, 2007.  Defendants Iran and MOIS failed to enter any appearance and failed to respond by that date.  No responses have been made by either Defendant to date.

7.      On July 2, 2007, Plaintiff requested the Clerk to enter a default, which was entered by the Clerk on July 6, 2007.  Docket No. 12.  On July 27, 2007, Plaintiff moved for default judgment.  Docket Entry No. 14.  On December 7, 2007, Plaintiff made his evidentiary

---

[1] Because there was no service on the IRGC they should be dismissed from this action.

submission consisting of affidavits, videos, and documents to the Court.  Plaintiff submitted proposed findings of fact and conclusions of law.

8.      On March 28, 2008, prior to the Court ruling on Plaintiff's default judgment motion, Plaintiff requested leave to file a First Amended Complaint[2] under the authority of § 1083 of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. 110-181 which was signed by the President and enacted into law on January 28, 2008.  The First Amended Complaint was lodged with the motion.

9.      The Court granted leave to file the First Amended Complaint on June 17, 2008. The Amended Complaint added three additional causes of action under federal common law. They are Wrongful Death (Count II), Solatium (Count III), and Intentional Infliction of Emotional Distress (Count IV-A).[3]

10.      Plaintiff continues to rely on his previously filed evidentiary submission in support of his renewed motion for default judgment on the Amended Complaint.  The evidentiary submission was filed on December 7, 2007, and a courtesy copy delivered to chambers.

## II.    FINDINGS OF FACT

1.      Plaintiff Lawrence Belkin is a United States citizen, born and raised in Pennsylvania.  After graduating Phi Beta Kappa from the University of Michigan in 1969, he

---

[2] Counts I and II of the First Amended Complaint charge Defendants with wrongful death; Count I under D.C. law and Count II under federal common law.  Count III charges loss of solatium under federal common law.  Count IV and Count IV-A charge the intentional infliction of emotional distress.  Count IV under District of Columbia state law and Count IV-A under federal common law.  Counts V-IX charge wrongful death, aggravated assault, violations of human dignity, and violations of international treaty obligations under the laws of Israel.  Count X charges Defendants with violation of customary international law (*jus cogens*).

[3] The Amended Complaint deleted the previously made claims for damages under the District of Columbia's Survival Act and for loss of consortium.

served three years in the U.S. Army and then four more years in the Army Reserves.  After his active duty discharge, he attended graduate schools in North Carolina where he received Masters Degrees in both Architecture and Regional Planning.  He worked in North Carolina from 1973 until mid-1981 when he moved to Israel and opened his own architectural design firm. Plaintiff's Exhibit 2, ¶¶ 1-5 (Belkin Declaration).

2.     When Mr. Belkin moved from North Carolina to Israel in 1981, he no longer maintained any residences or substantial contacts with any particular state in the United States. At the time he considered Israel to be his permanent residence.  He did maintain general contacts with the United States government including filing his U.S. income tax returns each year while he resided in Israel.  *Id.* at ¶ 6.

3.     Lawrence Belkin married Gail Belkin on March 23, 1995.  Gail had been born in Rhodesia and also lived in South Africa before she immigrated to Israel.  English was her native language.  By profession, she was a cosmetician and ran a successful business.  She became a citizen and resident of Israel.  At the time of her death, she was 48 years of age and had two adult daughters from a previous marriage.  *Id.* at ¶ 10.

4.     At the time of his marriage to Gail, Mr. Belkin was a widower with two children. His first wife died suddenly six years earlier in Israel when her car collided with a truck.  As a result of the tragic loss of his first wife, Belkin felt compelled to be the best husband he could to Gail, and was very close to her.  He made it a point to tell her every day how much he loved her, and often told her how he dreaded the thought of losing her through death as he did his first wife. Gail was to be his companion for the rest of his life.  *Id.* at ¶ 8.

## The March 4, 1996 Bombing Incident

5.     On the afternoon of March 4, 1996, Gail Belkin, her mother, and one of her daughters went shopping for a wedding dress in the Dizengoff Center Shopping Mall in Tel Aviv, Israel as her daughter was engaged to be married.  After a time, the daughter remained in the mall shopping by herself while Gail and her mother went outside.

At approximately 4:00 p.m. on March 4, 1996, a suicide bomber affiliated with the Shaqaqi faction of the Palestinian Islamic Jihad ("PIJ") detonated a 40-pound bomb that he was carrying just outside the doors of the shopping mall in the vicinity of Gail Belkin and her mother. Gail Belkin and her mother, plus 11 others, mostly women and children, were killed in the blast. 125 other individuals were injured.  *Id.*; Plaintiff's Exhibit 3, Expert Report of Dr. Patrick Clawson ("Clawson Report") at 5, 8.[4]

6.     The PIJ suicide bomber was identified as Ramez abed el Kader Machmad Abid, a resident of the Chan-Yuness refugee camp in Gaza.  He was a known activist in the PIJ with the Shaqaqi faction.  The police investigation determined that Abid had been smuggled into Israel that day by a truck driver traveling from Gaza to Tel Aviv.  Clawson Report at 6, 8.  *See* Plaintiff's Exhibit 4, Israeli Police Report, Event 27126 ("Israeli Police Report").

7.     Abid carried the bomb in a black bag with two carrying handles.  The main explosive was approximately 15 kilograms of TNT, around which was packed number 10 nails so as to cause maximum pain, suffering, and death to anyone in the vicinity of the detonation.

---

[4] Dr. Patrick Clawson has provided sworn expert testimony concerning the PIJ, Iran, MOIS and the IRGC in numerous cases before this Court.  In *Heiser* v. *Islamic Republic of Iran*, Dr. Clawson is described as a "renowned scholar of Middle Eastern politics, who has studied and written about Iran for years.  In over 20 cases, Dr. Clawson has repeatedly provided this Court with reliable and credible testimony regarding the involvement of Iran, MOIS and IRGC in sponsoring and organizing acts of terrorism carried out against citizens of the United States (citations to footnoted cases omitted).  466 F.Supp.2d 229, 265 (D.D.C. 2006) (Lamberth, J.).

The explosion was triggered by power from 9 volt batteries. When he arrived at the Dizengoff Center, Abid attached the bag to his shoulders. *Id.*

8.      The truck driver who drove Abid into Tel Aviv, Said Bin Hussain Sulimany, was subsequently indicted and prosecuted for smuggling Abid into Israel for the equivalent of $1,100 and for assisting in murder and sabotage. Sulimany, who was convicted for providing support to terrorists, admitted that he knew Abid was a PIJ member and that he was paid the equivalent of $1,100 by a PIJ leader to smuggle Abid into Tel Aviv. Clawson Report at p. 6.

9.      Both the PIJ and Hamas[5] claimed responsibility for the Dizengoff Center bombing. There is evidence that Hamas provided the bomb and that the PIJ provided the suicide bomber and facilitated his transportation to Tel Aviv where the bomb was detonated. The PIJ and Hamas are known to have collaborated in other terrorist bombings, including an April 6, 1994 incident where the suicide bomber in a car-bomb attack on a bus in Afala, Israel was a member of the PIJ, but the bomb was provided by Hamas. *Id.* at 6-7.

10.      The context for the PIJ's bombing of the Dizengoff Center was the ongoing peace discussions between Palestinian President Yassar Arafat and Israel. Iran, as well as its various agents, Hamas and the PIJ, was strongly opposed to any kind of recognition of Israel and sought by violence the rejection of the Middle East peace process. On February 28, 1996, Iranian Vice

_____

[5] Hamas, which is the popular name for the Islamic Resistance Movement (Harakat al-Muqawama al-Islamiya), is an organization that has been supported over the years by the Islamic Republic of Iran, primarily through Iran's Ministry of Information and Security ("MOIS"), and its Revolutionary Guard Corps. There are numerous opinions by judges of this Court which have found that Iran not only is a major source of support for Hamas, both financially and in terrorist training, but also that Iran fully knew of the purposes and objectives of Hamas and approved of them. *See, e.g., Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 124 ¶ 16; *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 262 (D.D.C. 2003); *Stern v. Islamic Republic of Iran,* 271 F.Supp.2d 286 (D.D.C. 2003); *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1, 3 (D.D.C. 2001); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C. 2002); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 5 (D.D.C. 2000); *see also In re Abu Marzook,* 924 F. Supp. 565 (S.D.N.Y. 1996).

President Habibi met with Hamas leaders and PIJ leaders (including Ramadan Abdallah Shallah) in Damascus, Syria.  It was reported that Habibi stressed the continuation of Iran's support for the Palestinian oppositionists working against the peace agreement.  Plaintiff's Exhibit 5, Patterns of Global Terrorism, 1996; Clawson Report at 4.  This statement and meeting occurred in the middle of several major bombings in Israel, including two February 25, 1996 bombings: one of a bus in Jerusalem[6] and the other of a soldier rest station in Ashkelon, plus a subsequent bombing of another bus in Jerusalem on March 3, 2006.  There is strong evidence that the Dizengoff Center bombing was actually planned to occur on February 25, 1996 in coordination with the two other bombings that did occur that day, but it did not occur because the truck driver, who was paid to drive the suicide bomber Abid into Tel Aviv, failed to show up that day.  Dr. Clawson opined that it was reasonable to conclude that Iran's Vice President Habibi discussed with PIJ leader Shallah Iran's support for the PIJ's suicide bombings against the Israelis.  The Dizengoff Center bombing happened a few days later.  *Id.*  Credible reports describe how Iran pledged to increase support based on major terror killings carried out by the PIJ.  Clawson Report at p. 2.

11.    The autopsy of Gail Belkin was performed by forensic pathologists Yehuda Hiss, M.D. and R. Nachman, M.D.  They found that she had suffered first and second degree burns on her head, neck, trunk, and limbs.  There were  numerous lacerations in those same areas.  Most significantly, the force of the explosion caused fractures of her cranial and facial bones as well as her ribs.  It was the opinion of the forensic pathologists that the cause of Gail Belkin's death was the detonation of explosives.  Plaintiff's Exhibit 6, Autopsy Report.

---

[6] This bombing has spawned four terrorism cases in this Court:  *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74 (D.D.C. 2006); *Mousa v. Islamic Republic of Iran,* 238 F.Supp.2d 1 (D.D.C. 2001); *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13 (D.D.C. 2002); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C. 2000).

12.     As a result of the death of Gail Belkin, her estate suffered a loss of accretions. This loss is based on a projected work history of 19 additional years to retirement age and then receipt of a pension for 15 years to her life expectancy of 82.7 years, based on the Israeli Bureau of Statistics life expectancy tables.  The total lost accretions for those 34 years is reduced to present value is $376,848.  She also had funeral expenses totaling $3,710.  The total amount is $380,558.  *See* Plaintiff's Exhibit 10, Economic Report of Dov. Weinstein, CPA ("Weinstein Report").

13.     Lawrence Belkin suffered severe emotional distress as the result of the bombing and gruesome death of his wife.  While not present at the Dizengoff Center at the actual time of the bomb's detonation, he learned about the bombing very shortly after it occurred, and he was immediately filled with anxiety knowing that his wife was then at the shopping center.  His fear and concern increased with each passing minute when he did not hear from his wife.

14.     The entire country of Israel was at a heightened state of tension and fear as the result of the spate of bombings that had recently happened and which took the lives of numerous innocent civilians, many of them children.  The anxiety immediately increased with the television media immediately broadcasting photographs of the massive damage at the area around the Center.  He was sickened as he watched the special crews of workers scouring the scene for every piece of human flesh that could be recovered, in accordance with Jewish law. *See* Belkin Declaration at ¶ 10; *see also* Plaintiff's Exhibit 7 (DVD of Israeli news showing post-bombing activity outside the Dizengoff Center).

Larry Belkin's anxiety further increased with each call to a hospital which responded that it had no information about a Gail Belkin.  The hospitals told him he should consider calling the morgue.  Within hours of the bombing, he was taken to the morgue to view the body of a woman

believed to be his wife. The body was so severely injured in the blast that he could not identify

his own wife while viewing it. He was only able to identify the jewelry that she was wearing,

particularly her distinctive wedding ring which he had given to her. Belkin Declaration, ¶ 11.

For over two years after his wife's death, Larry Belkin attended group therapy sessions to

deal with his grief and emotions. The program was operated by the Israeli government and all of

the participants were spouses of victims of terrorism. Even into 2004, eight years after Gail's

murder, he was treated by his physician for "Generalized Anxiety Disorder" which was

attributed to Gail's death and his experiences in Israel. On occasion, he still experiences an

overwhelming sense of anxiety associated with the events of Gail's death. Belkin Declaration,

¶¶ 12-14.

In 2001, Lawrence Belkin decided to move back to the United States to an environment

of greater quiet and less intensity. He currently resides in the Commonwealth of Virginia. *Id.* at

¶ 14.

## The Palestinian Islamic Jihad

15.    The Palestinian Islamic Jihad was founded by Sunni Islamic fundamentalist Fathi

Shaqaqi in the 1970s. Almost from the outset, PIJ leaders have proudly proclaimed their close

connection with the Iranian government. In 1981, Fathi Shaqaqi wrote a book about his

admiration for the Islamic Republic of Iran. Particularly remarkable about the PIJ's long

affiliation with Iran is how they have always worked together cooperatively notwithstanding the

longstanding disagreements between the Sunni and Shia Muslim factions, on both religious and

socio-economic grounds. PIJ leaders traveled frequently to Iran, often being shown in the

Iranian media meeting with top officials in the Iranian government. The PIJ actively defended

Iran and its ideology to Sunni extremists who were put off by Iran's Shiite majority. Plaintiff's

Exhibit 3, Clawson Report at 2-3; Plaintiff's Exhibit 8, Dr. Clawson's testimony in *Flatow v. Islamic Republic of Iran,* Civil Action No. 97-396 (March 3, 1998) ("Clawson's Testimony"), pp. 146-147.

16.     After the 1987 outbreak of a Palestinian popular uprising against Israel, the PIJ was the group which most loudly and openly proclaimed the need for terrorist attacks on Israeli civilians at a time when most other Palestinian extremists thought such attacks were unwise tactics.  The Shaqaqi faction of the PIJ was relatively small, numbering a few hundred members, but were particularly violent.  For the next 12 years, the PIJ had few activities other than carrying out terrorist acts (unlike other terrorist groups such as Hamas and Hezbollah which also undertook charitable and political activities).  Clawson Report at 2-4; Plaintiff's Exhibit 9, Clawson Testimony at p. 148; and Testimony of terrorism expert Harry B. Brandon in *Flatow v. Islamic Republic of Iran*, Civ. Action No. 97-396 ("Brandon Testimony") p. 174.

17.     The PIJ has been found responsible for many other terrorist attacks in Israel including the April 9, 1995 bus bombing in which Alisa Flatow was killed and Seth Haim was severely injured.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998); *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56 (D.D.C. 2006).

### Iran's Support for the PIJ

18.     In the mid-1990s, Iran had an urgent desire to disrupt the Middle East peace process which appeared to be moving forward at that time.  Iran considered terrorist activities in Israel and the wanton murder of Israeli civilians carried out by the PIJ as an effective means of damaging relations between Israel and the Palestinian Authority.  By supporting the PIJ, Iran enhanced its standing with radical Islamic extremists, especially among Sunni Muslims who would otherwise be hostile to the Shiite Islamic Republic of Iran.  Iran provided the PIJ not only

with financing, but also with advanced military training, and munitions technology that allowed the PIJ to evolve into a dangerous and effective terrorist organization. Clawson at p. 2.

19.     In 1990, after Fathi Shaqaqi arrived in Damascus, PIJ operatives began training at Hezbollah camps in Lebanon under supervision of Iranian Revolutionary Guards stationed in that country and carried out some joint operations with Hezbollah against Israeli forces in south Lebanon.

20.     The strong consensus among scholars of Palestinian extremism is that from 1988 until about 2000, the PIJ was heavily dependent on Iranian government support. Several experts, including Dr. Reuvan Paz and Harry B. Brandon, the former Chief of the FBI's Counterterrorism Section, opined in 1998 that the Iranian government was virtually the sole support of the PIJ. In a 1994 interview of Fathi Shaqaqi by Arab journalists, Shaqaqi denied the accepted figure that the PIJ was receiving $20,000,000 that year from Iran but admitted receiving $3,000,000 to support PIJ terrorism. Plaintiff's Exhibit 3, Clawson Report at p. 4; Plaintiff's Exhibit 9, Brandon Testimony, p. 176.

21.     The Iranian Ministry of Information and Security, during the 1990s and beyond, acted as a conduit for the Islamic Republic of Iran's provision of funds and training to the Shaqaqi faction for its terrorist activities in the Gaza strip region. Clawson Report at p. 5.

22.     The PIJ's dependence on Iran deepened after the 1995 death of Fathi Shaqaqi.[7] Shaqaqi's successor Shallah faced the challenge of showing that the PIJ was still an important force, especially as the larger Hamas organization had stepped up its terroristic activities. In the weeks prior to the Dizengoff bombing, Hamas had stepped up its activities to undermine Arafat and the Palestinian Authority. On the day before the Dizengoff bombing, in response to Israeli

_____

[7] Fathi Shaqaqi was shot and killed on October 26, 1995 by an unknown but professional assassin, generally believed to be an Israeli operative.

pressure following the spate of suicide bombings, Arafat outlawed paramilitary organizations including Hamas and the PIJ, and Palestinian police arrested 800 Islamic militants and seized large quantities of explosives.

23.    The Patterns of Global Terrorism 1996, covering acts of global terrorism in that year, stated "Iran remained the premier state sponsor of terrorism in 1996....  Iran continued to provide support – including money, weapons and training – to a variety of terrorist groups, such as Hizbollah, Hamas and the Palestine Islamic Jihad ("PIJ")."  Plaintiff's Exhibit 5.

24.    Iran was designated a state sponsor of terrorism in 1984 and has been on the State Department's list of state sponsors of terrorism ever since.  *See Dammarell v. Islamic Republic of Iran,* 404 F.Supp.2d 261, 273-74 (D.D.C. 2005) ("*Dammarell IV*"); *see also* 22 C.F.R. § 126.1(d) (2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979--Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).

25.    Iran utilizes various ministries and organizations to carry out its terrorist support activities.  The Ministry of Information and Security ("MOIS"), Iran's intelligence service, is a major Iranian agency designated by Iran to help organize Iranian government support to the PIJ. MOIS operates both within and beyond Iranian territory.  With approximately 30,000 agents, MOIS is the largest intelligence agency in the Middle East.  MOIS acted as a conduit for Iran's provision of funds and training to the Shaqaqi faction of the PIJ for its terrorist activities.  Iran's intelligence services facilitate and direct terrorist attacks.  MOIS' provision of material support and resources for terrorism is conducted with the approval of the highest levels of the Iranian

regime and falls squarely within the meaning of 28 U.S.C. § 1605(a)(7).  Clawson Report at 5, 7;

*accord, Haim,* 425 F.Supp.2d at 61; *Flatow,* 999 F. Supp. at 11.[8]

26.    Another means by which Iranian support to terrorism is carried out is through the

Iranian Revolutionary Guard Corps ("IRGC"), the activities of which are carefully controlled by

the Iranian government.  Since 1988, scores of PIJ operatives from the West Bank and Gaza have

received Iranian military and terrorist training at bases run by the IRGC in Lebanon and in Iran

itself.  Iran has provided the PIJ with explosives and weapons; and the training required to use

such weapons.  It is reasonably believed that these weapons came from IRGC stocks or through

IRGC channels.  Clawson Report at 7-8.

27.    Dr. Clawson opined, to a reasonable degree of certitude, that the Islamic Republic

of Iran, through its agencies MOIS and the IRGC, provided funding and training to the PIJ prior

to March 4, 1996, as well as after that date, in order to facilitate the PIJ's ability to carry out

terroristic activities, including suicide bombings, and particularly the suicide bombing on March

4, 1996 of the Dizengoff Center.  Such training would include how to operate explosive devices

and how to achieve maximum death and destruction.  Iran, through MOIS and the IRGC, would

have provided funding to carry out terrorist attacks required, including payment for smuggling

the suicide bomber through Israeli security to the place of detonation.  Plaintiff's Exhibit 3, at p.

8.

---

[8] Although not necessary to the resolution of this case in accord with 28 U.S.C. § 1608(e), the
Court may take judicial notice of facts and conclusions made by Judge Lamberth in the *Flatow*
and *Haim* cases.  While the event underlying those two cases occurred 11 months prior to the
event in this matter, the longstanding relationship between Iran and the PIJ found by the Court in
those two cases (that were decided eight years apart) is relevant to this case, particularly so
because they are so consistent.  *See Heiser*, 466 F.Supp.2d at 262-263; *Haim,* 425 F.Supp.2d at
60; Fed. R. Evid. 201(e).

III.    **CONCLUSIONS OF LAW**

A.    **Jurisdiction**

1.    In the United States, the Foreign Sovereign Immunities Act ("FSIA") establishes a broad rule that foreign states are immune from suit in United States courts.  The statute also sets out certain exceptions to the rule for limited categories of cases.  Thus, the FSIA provides the sole basis for asserting jurisdiction over foreign sovereigns.  *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434-34 (1989).  A party may not generally bring an action for money damages in U.S. courts against a foreign state.  28 U.S.C. § 1604.  The "state-sponsored terrorism" exception now set forth at 28 U.S.C. § 1605A, and formerly at 28 U.S.C. § 1605(a)(7), removed a foreign state's immunity to suits for money damages brought in U.S. courts where plaintiffs seek damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in Section 2339A of Title 18) for such an act if such act or provision of material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency."  *Id.; Heiser*, 466 F.Supp.2d at 304 (D.D.C. 2006),

2.    On January 28, 2008, the NDAA, Pub. L. No. 110-181, 122 Stat 3, was enacted into law.  Section 1605(a)(7) of Title 28 was repealed[9] and replaced by a new section codified at § 1605A of the same title.  *See Simon v. Republic of Iraq,* Nos. 06-7175 and 06-7178, Slip. Op. at 2 (D.C. Cir. June 24, 2008).

---

[9] Where a pending action was brought under 28 U.S.C. § 1605(a)(7) and is not refiled under § 1605A, the district courts retain jurisdiction pursuant to § 1605(a)(7) over cases that were pending under that section when Congress enacted the NDAA.  *See Simon, supra* at p.8.

3.      Section 1083(c)(3), in relevant part, authorizes a plaintiff, *i.e.,* Belkin, who has "timely commenced" a "related action" under § 1605(a)(7), to bring any other action arising out of the same act or incident," provided "the [new] action is commenced" within 60 days of "the date of the enactment of [the NDAA]."  *Simon*, *supra* at 8-9.

4.      The NDAA was enacted on January 28, 2008.  Plaintiff Belkin commenced this "related action" on March 28, 2008, within the 60-day window of the NDAA.

5.      Section 1605A(c) of the NDAA abrogates *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C. Cir. 2004) by creating a federal private right of action against foreign states, for which punitive damages may be awarded, for personal injury or death caused by an extrajudicial killing or by the provision of material support or resources by the foreign state.  *See* § 1605A(a)(1) and (c)(1); *see also Simon, supra,* at 6.

6.      Prior to the Circuit's 2004 ruling in *Cicippio-Puleo,* the district courts had been recognizing a federal private right of action under § 1605(a)(7) against foreign states for economic damages, intentional infliction of emotional distress, solatium, wrongful death and punitive damages.  353 F.3d at 1036; *see* 28 U.S.C. § 1605A(c).

7.      The requirements in order to subject a foreign sovereign to suit under section 1605A are, in relevant part, here,[10] similar to the requirements of now repealed § 1605(a)(7):  A plaintiff must show that:  (1) the foreign sovereign was designated by the U.S. State Department as a "state sponsor of terrorism" when the acts occurred and remains so designated when the matter was refiled; *see* 1605A(a)(2)(A)(i)(I); (2) the victim or claimant was a U.S. national at the

---

[10] Section 1605A expanded the potential class of plaintiffs by including any member of the armed forces or any employee or contractor of the U.S. government, regardless of nationality. *See* 1605A(a)(2)(A)(ii)(II) and (III).

time the acts took place; § 1605A(a)(2)(A)(ii)(I); and (3) the foreign sovereign engaged in

conduct that falls within the ambit of the statute, § 1605A(a)(1).

       8.      Each of the requirements is met in this case.  First, Defendant Iran has been

designated a state sponsor of terrorism continuously since January 19, 1984, and was so

designated at the time of the attack.  *See* 22 C.F.R. § 126.1(d); 31 C.F.R. § 596.201 (2001).

Second, the Plaintiff was a United States citizen when the murder of Decedent occurred and at

the time of this action.  Finally, Defendant Iran's persistent financial and organizational material

support of the entity or entities that committed an extrajudicial killing and the provisions of

material support squarely falls within the ambit of the statute.[11]  Defendants MOIS and the IRGC

are considered to be a division of the State of Iran, and is therefore treated as a member of the

State of Iran itself.  *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003), *cert.*

*denied*, 542 U.S. 915 (2004); *see also Salazar*, 370 F.Supp.2d at 116 (analogizing the IRGC to

the MOIS for purposes of liability, and concluding that both must be treated as the State of Iran

itself).  Therefore, the same determinations that apply to the conduct of MOIS and the IRGC

apply to the conduct of Iran.

     **B.**     **Service of Process**

      Personal jurisdiction exists over a non-immune sovereign as long as service of process

has been made under section 1608 of the FSIA.  *See Stern v. Islamic Republic of Iran,* 271

F.Supp.2d at 298 (D.D.C. 2003); *see also* Fed. R. Civ. P. 4(j).  In this case, service of process has

---

[11] The FSIA utilizes the same definition of "extrajudicial killing" as the Torture Victim
Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberate killing not
authorized by a previous judgment pronounced by a regularly constituted court affording all
judicial guarantees which are recognized as indispensable by civilized people."  *See Peterson v.*
*Islamic Republic of Iran,* 264 F.Supp.2d 46, 61 (D.D.C. 2003).

been effected on all three Defendants under § 1608(a)(4).  *See* Plaintiff's Exhibit 1.

Accordingly, this Court has *in personam* jurisdiction over defendants Iran, MOIS and the IRGC.

### C.    Legal Standard for FSIA Default Judgment

As previously mentioned, in an action over which subject matter jurisdiction exists by

virtue of the "terrorism exception" of  28 U.S.C. § 1605A "[n]o judgment by default shall be

entered by a court of the United States or of a state against a foreign state … unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C.

§ 1608(e); *Roeder,* 333 F.3d at 232-33.  In default judgment cases, plaintiffs may present such

evidence in the form of affidavits.  *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d at 82;

*Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 250, 268 (D.D.C. 2003).  Upon

evaluation, the court may accept any uncontroverted evidence presented by Plaintiffs as true.

*Heiser*, 466 F.Supp.2d at 255 (*citing Campuzano*, 281 F.Supp.2d at 268).  This Court accepts and

credits the uncontested evidence and testimony submitted by Plaintiff and his witnesses as true,

not only  in light of the fact that the Defendants in this action have not objected to it or even

appeared in this action to contest it, but also because it is relevant and highly probative of the

claims asserted.

### D.    Liability

#### 1.    Proper Causes of Action Under the FSIA

The FSIA, as amended, allows private federal causes of action.  28 U.S.C. § 1605(a) and

(c).  It also allows more traditional substantive causes of action against private individuals that

may exist in either state or international law."  *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d

40, 54 (D.D.C. 2006); *see Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d at 1027.  As to

the state-law based claims, normally the forum jurisdiction's choice of law rules, here the

District of Columbia's, apply to determine which state's law shall govern. *Bodoff v. Islamic Republic*, 424 F.Supp.2d at 79 (D.D.C. 2006). Normally, the law of the United States applies rather than the law of the place of the tort or any other foreign law because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *Heiser,* 466 F.Supp.2d at 266. *See Dammarell,* 2005 WL 756090 at *20, 2005 U.S. Dist. LEXIS 5343 at *63 ("*Dammarell II*").[12]

    E.    **Choice of Law**

    1.    Prior to the *Cicippio-Puleo* decision in January, 2004, wherein the Court of Appeals ruled that there was no such thing as federal common tort law, the various district courts routinely, in their traditional choice of law analysis in *Flatow* Amendment cases, applied federal common law over state substantive tort law. *See Bettis v. Islamic Republic of Iran,* 315 F.3d 325, 330-31 (D.C. Cir. 2003). Indeed, applying federal common law was believed to be superior to applying state law because such might eventually result in situations where the recoveries would necessarily be different for eventually identical conduct. *See Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128, 134-135 (D.D.C. 2001); *Flatow v. Islamic Republic of Iran*, 999 F. supp. 1, 15 (D.D.C. 1998) (applying "interstitial federal common law" so that "federal courts

---

[12] Plaintiff submits that this state law analysis may not be necessary in light of the federal common law claims added in the Amended Complaint. For example, Count I charges wrongful death under District of Columbia law, Count II charges wrongful death under federal common law and Count V charges in essence wrongful death (damage to a person) under Israeli law. Obviously, only one recovery is permissible under a wrongful death theory. Since Count II is the simplest course of action not requiring any choice of law analysis, it may be the simplest way to proceed.

    Similarly, Counts III, IV, and IV-A charge loss of solatium, and intentional infliction of emotional distress under D.C. law and federal common law. Solatium was the vehicle generally used to calculate damages for the shock and loss of a murdered family member prior to *Cicippio-Puleo.* Post *Cicippio-Puleo,* Courts turned to IIED counts to award damages to the immediate family of a victim murdered by state sponsored terrorism. Again, there is essentially one recovery for these three Counts.

[would]create coherent national standards for the purpose of "promoting uniformity of determinations with respect to the liability of foreign states for their terrorist acts."  Applying federal common law was considered particularly appropriate in the District of Columbia as it was the venue commonly used with respect to the liability of foreign states for terrorist acts.  *Bettis,* 315 F.2d at 332.

In 2004, *Cicippio-Puleo* abruptly and drastically changed this analysis and forced plaintiffs to rely on state, statutory or international law to supply the rule of decision in terrorism cases against foreign countries.  Failure to heed this requirement drew severe consequences.  *See Acree v. Republic of Iraq,* 370 F.3d 41, 49, and 60.

With the re-introduction of federal common law under § 1605A(a), it is reasonable for the court to again apply it, either to the exclusion of or in addition to the varying state laws. Indeed, there is already a large pool of terrorism cases in this district which have relied on federal common law and there is a good and substantial basis to return to that established body of law.

2.      Were the Court not to rely on federal common law, it would then need to apply the so-called "refined government interest analysis,"[13] pursuant to which they "evaluate the government policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Bodoff*, 424 F.Supp.2d at 83, *quoting Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989); *see also Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 68-69 (D.D.C. 2006). When this test is applied, it "typically leads to the application of the law of the plaintiff's

---

[13] Also referred to as a "modified government interest analysis."  *Heiser*, 466 F.Supp.2d at 266.

domicile, as the state with the greatest interest in providing redress to its citizens." *Id.,* 425

F.Supp.2d at 69 *citing Dammarell I.* 2005 U.S. Dist. LEXIS 5343 at *66-67.

Should the Court choose to use non-federal common law in light of the particular

circumstances of Lawrence Belkin, the facts are that he moved his permanent residence to Israel

in 1981.  While he maintained contacts with the United States by filing his U.S. tax returns each

year, he did not maintain any affiliation with any particular state.  This state of affairs was in

place in March 1996 when Gail Belkin was killed by the suicide bomber.

In similar post-*Cicippio-Puleo* cases where the victims of terrorist acts are United States

citizens with no current domicile in the United States at the time of the terrorist activity, several

courts have decided that the District of Columbia has "the greatest interest" for choice of law

purposes and its law is applied.  *See, e.g.*, *Bodoff*, 424 F.Supp.2d at 83-84; *Haim*, 425 F.Supp.2d

at 69.

**F.        Substantive Vicarious Liability for the Torts Committed the PIJ**

One of the substantive bases of the Defendants' liability is that they at a minimum

engaged in the "provision of material support and resources" to the PIJ, which carried out the

terrorist bombing of the Dizengoff Center and caused the death of Gail Belkin.  The acts of

another may render a party liable "under theories of vicarious liability, such as conspiracy, aiding

and abetting and inducement."  *Haim*, 425 F.Supp.2d at 69.  The Court will examine the

applicability of each of these theories, as deemed necessary.[14]

1.        Vicarious Liability

The asserted basis of Defendants' liability is that they provided material financial support

and resources to the PIJ, the terrorist organization whose members planned and executed the

---

[14] Where the facts found by the Court suffice to establish any one of these bases of vicarious
liability, the Court need not go further.  *See, Haim* at 69.

suicide bombing in which Gail Belkin was killed. Under the theory of vicarious liability, a party may be liable for the acts of another, under rubrics including conspiracy, aiding and abetting, and inducement. Accordingly, this Court finds that at a minimum, that civil conspiracy provides a basis of liability in this case against Defendants Iran and MOIS, provided such a theory exists under District of Columbia law. *See Heiser,* 466 F.Supp.2d at 266-268.

      2.      Civil Conspiracy

      Civil conspiracy is also recognized under District of Columbia law as a basis for imposition of vicarious liability for civil torts. It exists when the following elements are present: (1) an agreement between two or more persons or entities; (2) to participate in an unlawful act or in an otherwise lawful act in an unlawful manner; (3) that an injury or death or other damages caused by an unlawful overt act performed by one of the parties to the agreement and (4) pursuant to or in furtherance of the common scheme. *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) *citing Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

      It is axiomatic that the "agreement" element "may be inferred from conduct." *Bodoff*, 424 F.Supp.2d at 84 *citing Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001); *see also Haim*, 425 F.Supp.2d at 69. Plaintiffs have established based on the evidence submitted to this Court, most notably the Clawson Report, Exhibit 3, that Iran, MOIS, the IRGC and the PIJ acted in concert because they had agreed to commit high profile terrorism activities to promote Iran's brand of revolutionary Islamic ideology and to further the goal of damaging Israel and its citizens as well as United States interest whenever possible. *Id.* at pp. 3-4. Such agreement may also be inferred from the substantial financial support and training that Iran, MOIS and the IRGC provided to the PIJ. *See, id.,* pp. 2-4. The very "'sponsorship of terrorist activities inherently

involves conspiracy to commit terrorist acts.'" *Bodoff*, 424 F.Supp.2d at 84, *quoting Flatow,* 999 F. Supp. at 27.

The evidence also clearly establishes that the PIJ carried out the sequence of tortious conduct which killed Decedent. *See* Clawson Report, pp. 5-7. Dr. Clawson's Report also demonstrates to the satisfaction of this Court that torts alleged by Plaintiffs were carried out in "furtherance of the scheme" between the PIJ, Iran, MOIS, the IRGC, and likely Hamas, to disrupt the Middle Eastern peace talks. *See, id.* at p. 6. For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to the Defendants and the PIJ perpetrators. *See also Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 108-109 (D.D.C. 2007) (civil conspiracy basis for vicarious liability established with respect to Iran and MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks in Beirut).

### 3. Other Bases of Vicarious Liability

There is also clear evidence here for adjudicating Iran, MOIS and the IRGC as liable under vicarious liability theories which are separate and distinct from civil conspiracy. Iran has provided initiative and the approval of the funding, and likely directly or indirectly provided the deadly explosive to carry out the terrorist attack at issue here. *See* Clawson Report, pp. 7-8. As a result of its action, through its agents MOIS and IRGC, these Defendants are also liable for aiding and abetting as well as inducement of the deadly terrorist bombing. *See* 18 U.S.C. §§ 2(a), 2(b); s*ee also Bodoff*, 424 F.Supp.2d at 84. In addition to conspiracy, aiding and abetting and inducement are legal theories upon which a court may predicate vicarious liability. *See Halberstam,* 705 F.2d at 481-486.

In conclusion, there exist multiple legal bases for the imposition of vicarious liability on Defendants Iran, MOIS and the IRGC for the torts of the PIJ.

### G.    Solatium and Intentional Infliction of Emotional Distress

1.    Solatium.  Count III of the First Amended Complaint seeks recovery for solatium damages under 28 U.S.C. § 1605A(c).  Counts IV and IV-A in that Complaint both seek recovery for intentional infliction of emotional distress; Count IV under the common law of the District of Columbia and Count IV-A under the recently enacted federal common law in § 1605A(c) permitting recovery for pain and suffering in terrorism cases.  The Courts in this jurisdiction have generally viewed solatium and intentionally inflicted emotional distress claims as being closely connected.  *See, Surette v. Islamic Republic of Iran,* 231 F.Supp.2d 260, 267 n.5 (D.D.C. 2002) ("In the context of FSIA cases, this Court has recognized the claim of solatium as … indistinguishable from the claim of intentional infliction of emotional distress"); *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C. 2002) (relying on the Restatement (Second) of Torts describing intentional infliction of emotional distress standards in making solatium awards).  *Prevatt v. Islamic Republic of Iran,* 421 F.Supp.2d 152, 160-161 (utilizing pre-*Cicippio-Puleo* solatium awards as equivalent to post-*Cicippio-Puleo* intentional infliction of emotional distress awards).  Plaintiff recognizes that there can be but one award of damages for the claim made in these three counts.

2.    From a choice of laws standpoint, any damages award made for solatium or IIED will be the same regardless of the cause of action utilized.  Under a pre-*Cicippio-Puleo* analysis where the Courts recognized that a plaintiff could proceed under state tort law or federal tort law, it was determined that utilizing federal common law tort theories was the better option because it would avoid the potential of differences in damage awards due to inconsistent state laws and

would promote uniformity regardless from which state a plaintiff hailed. *Wagner,* 172 F.Supp.2d at 134-35; *Flatow,* 999 F. Supp. at 15.

       3.      Solatium damages must be based on federal common law because the District of Columbia Court does not recognize solatium damages. *See Runyon v. District of Columbia,* 463 F.2d 1319, 1322 (D.C. Cir. 1972). In pre-*Cicippio-Puleo* cases, solatium damages were available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim on terrorism. *See Flatow,* 999 F. Supp. at 29; *Surette v. Islamic Republic of Iran,* 231 F. Supp. at 269-70. A claim of solatium is for the mental anguish, bereavement and grief that those with a close personal relationship to the decedent experience as the result of the decedent's death, as well as the harm caused by the loss of decedent; society and comfort. *Dammarell,* 281 F.Supp.2d at 196-197; *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 110 (D.D.C. 2000). Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress. *Stethem v. Islamic Republic of Iran,* 201 F. Supp. at 89.

       Prior to the *Cicippio-Puleo* decision in January 2004, Courts regularly recognized the distress of spouses of terrorism victims by awarding solatium damages to such spouses. *See Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 23 (D.D.C. 2002); *Higgins. v. Islamic Republic of Iran,* 2000 WL 33674311 at *7-8 (D.D.C. Sept. 21, 2000); *see also Alejandre v. Republic of Cuba,* 996 F. Supp. 1239, 1249 (S.D. Fla. 1997). In those cases, the courts awarded between $8 million and $12 million in solatium damages to the surviving spouse.

       4.      Intentional Infliction of Emotional Distress – Count IV-A. This tort was also recognized as a federal common law cause of action prior to the January 2004 *Cicippio-Puleo* decision. *See, e.g., Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 48-52 (D.D.C.

2001); *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222, 234-35 (D.D.C. 2002); *Surette v. Islamic Republic of Iran,* 231 F.Supp.2d at 268-269; *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 91-92; *Dammarell v. Islamic Republic of Iran,* 281 F.Supp.2d at 188-89.  These cases relied extensively on the Restatement (Second) of Torts, Section 46.

        Should the Court choose not to utilize the federal common law regarding the causes of action in Counts III and IV-A, then the IIED claim in Count IV brought under District of Columbia law may be applied.  District of Columbia law permits IIED claims as asserted by Plaintiff.  The elements of the IIED tort under District of Columbia law are "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the Plaintiff severe emotional distress.  *Ben Rafael v. Islamic Republic of Iran,* 540 F.Supp.2d 39, 56 (D.D.C. 2008); *Bodoff*, 424 F.Supp.2d at 85, *citing Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984); *Dammarell v. Islamic Republic of Iran,* 404 F.Supp.2d 261, 275 ("*Dammarell IV")*(D.D.C. 2005) (same).  Based on the evidence submitted in this case, these elements are satisfied here.  It is well established that "a terrorist attack constitutes extreme and outrageous conduct."  *Bodoff,* 424 F.Supp.2d at 85; *see also Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d at 89 ("[A]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally terror.")  The second element of the IIED tort is also established here as the suicide bombing was carried out intentionally and recklessly.  *See Ben Rafael v. Islamic Republic of Iran,* 540 F.Supp.2d at 56 (elements of District of Columbia IIED found to be  satisfied in 1992 bombing of Israeli Embassy ); *see also Bodoff*, 424 F. Supp. at 85.

The third element of causing the plaintiff severe emotional distress is amply demonstrated here.  Lawrence Belkin has established in detail in his Declaration the severe emotional distress that resulted from the brutal murder of his wife.

It also cannot be overlooked in this case that Plaintiff Lawrence Belkin was virtually present throughout the events of this suicide bombing.  He was well aware that his wife was going to the Dizengoff Center, learned of the explosion there shortly after it occurred, and then watched on television as news teams broadcast the chaos and carnage at the scene, including pictures of the "special teams" – who were responsible for collecting all pieces of human flesh – moving about the area.  And unlike many of the IIED family member victims who have recovered IIED damages, he was, within hours, standing next to a battered woman's body that was in fact his wife, but whom he could not even identify due to the extent of her injuries.  He was only able to identify her by her wedding ring.  As the post-mortem photographs in Plaintiff's Exhibit 6 show, she was badly disfigured due to cranial and facial fractures.  It is hard to imagine anything that could be more shocking and distressing to a loving spouse.  Accordingly, the Court concludes that Lawrence Belkin is entitled to the recovery of damages for IIED caused by the brutal murder of his wife under District of Columbia law.

> **H.    Plaintiff's Wrongful Death Claims**

1.    Count I alleges wrongful death under District of Columbia law (16 D.C. Code § 2701), Count II alleges wrongful death under federal common law (28 U.S.C. § 1605a(c)), and Count V alleges wrongful death under Israeli law.  Each of these counts seek essentially the same remedy – compensation for economic losses in the form of lost wages, benefit, retirement pay and funeral expenses incurred as the result of the extrajudicial killing of Gail Belkin under the direction of Defendants.

Plaintiff recognizes that only one recovery for these economic damages is permissible. Choice of law rules become more complicated in wrongful death cases where the death occurred in Israel and, in significant measure, suggested to Plaintiff that he should file an amended complaint and take advantage of the NDAA's reinstatement of a federal common law wrongful death cause of action.

2.      Courts in this jurisdiction, when faced with post-*Cicippio-Puleo* and pre-NDAA with the decision of which wrongful death law to apply to a non-U.S. resident's death in a foreign country, have taken varying positions. Some courts have looked to the decedent's state of domicile for governing law, *see, e.g., Heiser,* 466 F.Supp.2d at 271-356, while others have looked at the domiciles of the statutory beneficiaries. *See Dammarell IV*, 404 F.Supp.2d at 281-282. In *Bodoff, supra,* where the decedent was never domiciled in any U.S. state, the court applied the forum state's law, specifically the law of the District of Columbia. 424 F.Supp.2d at 83.

The majority of courts have taken the position that District of Columbia's wrongful death law should be used where the death occurred outside the United States and the plaintiff, while an American citizen, is not a resident of any state. *See, e.g., Ben Rafael,* 540 F.Supp.2d at 58; *Bodoff,* 424 F.Supp.2d at 85. However, one Court has determined to the contrary that the geographical constraints in D.C. Code § 16-2701 and the domicile of the victim requires the application of Israeli law where an American resident of Israel is killed in Israel. *See Wachsman ex rel. Wachsman v. Islamic Republic of Iran,* 537 F.Supp.2d 85, 95-96 (D.D.C. 2008).

3.      Count I: Wrongful Death Under The District of Columbia Statute. A recovery under the District of Columbia Wrongful Death Act, 16 D.C. Code § 2701 *et seq.* is comprised principally of the pecuniary loss of a decedent's share of the decedent's anticipated future

earnings (discounted to present value). Such recovery is solely for the benefit of the decedent's spouse and next of kin.[15]  It creates a remedy for close relatives to the deceased who might in the normal course have expected maintenance or assistance from the deceased had she lived. *Lewis v. Lewis,* 708 A.2d 249, 251-252 (D.C. 1998); *Doe v. Binker,* 492 A.2d 857, 860-61 (D.C. 1985); *Strother v. District of Columbia,* 372 A.2d 1291, 1295-96 (D.C. 1977); *Semler v. Psychiatric Institute of Washington, D.C.,* 575 F.2d 922, 924-925 (D.C. Cir. 1978); *Runyon v. District of Columbia,* 463 F.2d 1319, 1321-1323 (D.C. Cir. 1972); *see also* Civil Jury Instructions §§ 14.02 and 14.03 (where both Survival Actions and Wrongful Death Actions are to be considered by the jury in a single trial).

Damages recovered for wrongful death are not "assets of the decedent's estate" and are not appropriate to be used for payment of debts or liabilities of decedents. Rather, any amount recovered in a wrongful death action goes directly to the benefit of the decedent's spouse or next of kin. *Strother v. District of Columbia, supra.*  If a person dies as the result of another's negligence but has no spouse or domestic partner or next of kin, there can be no wrongful death recovery. *Niosi v. Aiello*, 69 A.2d 57 (D.C. 1949).

4.       Count V:  Wrongful Death Under the Israeli Statutes.  Israel has a wrongful death statute which is charged in Count V, and which is very similar in effect to the wrongful death law in the District of Columbia.  Israeli's Supreme Court has held in *Ettinger Estate v. Jewish Quarter Company,* Civil Appeal 140/00 [2004], IsrLR 97 (15 March 2004) that in an Israeli wrongful death action, designated individuals, specifically the spouse, parents, and children of the deceased, are entitled to compensatory damages for the loss of his earnings capacity in the

---

[15] The fact that the emotional distress was intentionally caused, as opposed to negligently caused (in negligent infliction of emotional distress claims), further supports under District of Columbia law the award of compensation. *See, e.g., Parker v. Stein,* 557 A.2d 1319, 1322 (D.C. 1989). Indeed, D.C. even permits the recovery of punitive damages where the tort is intentional. *Id.*

"lost years" – the years of work "lost" due to the death of the decedent. *See Ettinger Estate* at p.

129, ¶ 28. A copy of *Ettinger Estate* is attached hereto as Plaintiff's Exhibit 11.

   5.  Count II: Wrongful Death Under Federal Common Law. Utilizing the federal

common law tort of wrongful death will avoid the issue of conflicting choice of law

determinations as described above. As amended by the NDAA, the Foreign Sovereign

Immunities Act permits plaintiffs to seek economic damages from a foreign state for "death"

caused by "extrajudicial killing" such as the suicide bombing of the Dizengoff Center. 28 U.S.C.

§ 1605A(c). Prior to *Cicippio-Puleo*, courts regularly awarded economic damages in the form of

wages and retirement pay and out of pocket funeral expenses for the benefit of individuals who

have had family members killed in terrorist acts. *See, e.g., Kerr v. Islamic Republic of Iran,* 245

F.Supp.2d 59, 65 (D.D.C. 2003); *Surette,* 231 F.Supp.2d at 274; *Stethem,* 201 F.Supp.2d at 287-

88. *Wagner,* 172 F.Supp.2d at 136, *Flatow,* 999 F. Supp. at 28.

   The Court concludes that it is appropriate to utilize the federal common law wrongful

death tort revived under the NDAA under the facts of this case. There is a significant body of

law supporting this decision, it will avoid creating disparate results that might flow from utilizing

District of Columbia or Israeli law, and it demonstrates the strong interest that this country has in

protecting its citizens regardless of where they may reside.

## IV.  DAMAGES

###   A.  Compensatory Damages

   To obtain damages against defendants in an FSIA action, the plaintiff must prove that the

consequences of the defendants' conduct were "reasonably certain (i.e., more likely than not) to

occur, and must prove the amount of the damages by a "reasonable estimate consistent with this

[Circuit's] application of the American rule on damages. *Salazar,* 370 F.Supp.2d at 115-16

(quoting *Hill v. Republic of Iran*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted). Because there have been so many cases in this District where family members have been killed by terrorist bombings, this Court is by no means writing on a proverbial "clean slate" in fashioning a damages remedy in this case. To the contrary, this Court is guided by remedial approaches and formulas, utilized in similar cars. *Prevatt,* 421 F. Supp. at 160; *Haim*, 425 F.Supp.2d at 71.

　　　　1.　　　Plaintiff's IIED Damage Awards

While the loss suffered by a spouse is difficult to quantify, courts typically award between $8 million and $12 million for the emotional distress resulting from the death of a spouse. *See, e.g., Heiser,* 466 F.Supp.2d at 293; *Greenbaum v. Islamic Republic of Iran,* 451 F.Supp.2d 90, 107-108 ($9 million to husband of woman killed by suicide bomber); *Salazar,* 370 F.Supp.2d at 116 (awarding $10 million to the widow of a bombing victim); *Kerr v. Islamic Republic of Iran*, 245 F.Supp.2d 59, 64 (D.D.C. 2003) (award of $10 million to the widow of a torture and hostage taking victim). One recent award to a spouse was for $30 million. *Estate of Bayani v. Islamic Republic of Iran,* 530 F.Supp.2d 40, 46 (D.D.C. 2007) ($30 million awarded to spouse whose husband was tortured and executed).

Based upon the wealth of cases involving immediate family members of civilians killed in terrorist bombings, this Court awards IIED damages of $10 million to Lawrence Belkin in his individual capacity as the husband of the Decedent. The Court believes this award is appropriate in this case as it is not unlike the awards to other spouses whose wives or husbands were killed in suicide bombings. *See Greenbaum, supra.* The Court believes, however, that Lawrence Belkin is particularly entitled to this higher award due to the extreme shock he experienced when he had to view his wife's severely disfigured body shortly after the bombing occurred. Such a shocking

experience is one that will never be shed and will long continue to cause pain and anxiety. For that reason, the Court will award Lawrence Belkin $10 million on his intentional infliction of emotional distress claim.

      2.     Wrongful Death Damages Award

Under the District of Columbia Wrongful Death Act, the allowed recovery is based on pecuniary damages which Plaintiff might reasonably be expected to have received from the deceased had his wife lived. *Lewis*, 708 A.2d at 251-252; *see also Wagner*, 172 F.Supp.2d at 135, n. 11. Here, Plaintiff has submitted a report from forensic economic expert Dov Weinstein, Plaintiff's Exhibit 10, Weinstein Report. The Weinstein Report bases its calculations on reasonable and well founded assumptions about the likely earnings of Gail Belkin had she survived. *Id.*, Exhibit 10. Mr. Weinstein concluded that Mrs. Belkin would have worked for 19 more years and then, based on here life expectancy, received a pension for 15 additional years. Based upon this forensic evidence, the "loss of accretions" of Gail Belkin reduced to present value would be $376,848. The amount of $3,710 for her funeral expenses. *See* Findings of Fact, Exhibit 12, p. 7 *supra.*

The Court hereby awards Plaintiff wrongful death damages in the amount of $376,848 and $3,710, respectively,

**B.    Punitive Damages**

Plaintiff is withdrawing his punitive damages demand. Punitive damages are to be awarded only to direct victims of terrorism – either to persons actually held as hostages or to the estates of homicide victims. *Bodoff,* 424 F.Supp.2d at 74; *Campuzano v Islamic Republic of Iran,* 281 F.Supp.2d 205, 278 (D.D.C. 2003). Punitive damages are not to be awarded to family members of hostages or family members of deceased victims of terrorism – as Plaintiff Belkin is

in this case.  Moreover, because Gail Belkin was not a U.S. national at the time of her death, her

estate, to which punitive damages would normally be awarded, lacks standing to sue in this

court.

### C.    Prejudgment Interest

Plaintiff requests prejudgment interest for his IIED claim.  "It is within this Court's

discretion to award plaintiffs prejudgment interest from the date of the bombing … until the date

of final judgment…."  "[c]ourts in this Circuit have awarded prejudgment interest in cases where

plaintiffs were delayed in recovering compensation for their injuries – including, specifically,

where such injuries were the result of targeted attacks perpetrated by foreign defendants."  *Pugh

v. Socialist People's Libyan Arab Jamahiriya,* 530 F.Supp.2d 216, 263 (D.D.C. 2008) (relying

on *Oldham v. Korean Air Lines Co.,* 127 F.3d 43, 54 (D.C. cir. 1997); and *Forman v. Korean Air

lines Co.,* 84 F.3d 446, 450 (D.C. Cir. 1996); *quoted in Ben Rafael,* 540 F.Supp.2d at 59.  The

court concurs that prejudgment interest is appropriate in this case and awards Plaintiff

prejudgment interest computed at a rate of six percent per annum on a simple interest basis from

March 4, 1996 to the present.

### D.    Other Causes of Action Asserted in the Complaint

In light of these Findings of Fact and Conclusions of Law, it is not necessary for the

Court to address the other causes of action asserted by the Plaintiffs under either Israeli law or

under customary international law for the reasons stated in *Beaty v. Islamic Republic of Iraq,* 480

F.Supp.2d at 92-93.  (Count X).

## V.    CONCLUSION

Because Plaintiff has established severe emotional distress as a direct and proximate

result of Defendants' extreme and outrageous conduct and because the evidence in the record

amply supports the allegations in the Complaint, a judgment consistent with these findings will be entered against Defendants Iran, MOIS, and the IRGC in the amount of $10 million plus prejudgment interest dated to March 4, 1996 when Gail Belkin was murdered.  The Court awards $376,858 in lost accretions and $3,710 in funeral and burial costs under Plaintiff's wrongful death claim.

A judgment in accordance with these findings and conclusions shall issue as of the date of the Court's Memorandum Opinion and Order.


Dated:  August 1, 2008                                    Respectfully submitted,


/s/ Paul L. Knight
Paul L. Knight (D.C. Bar #911594)
Emil Hirsch (D.C. Bar #903479)
O'Connor & Hannan, LLP
1666 K Street, NW, Suite 500
Washington, DC  20036
Telephone:  (202) 887-1400
Facsimile:  (202) 466-3215

*Attorneys for Plaintiffs*