UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
LAWRENCE BELKIN,                                 )
                                                )
                    Plaintiff,                   )
                                                )
        v.                                       )         Civil Action No. 06-0711 (PLF)
                                                )
ISLAMIC REPUBLIC OF IRAN, *et al.*,              )
                                                )
                    Defendants.                  )
_____         )


OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

        This matter is before the Court on plaintiff Lawrence Belkin's motion,

individually and as next of kin of Gail Belkin, for default judgment under Rule 55 of the Federal

Rules of Civil Procedure, based on the sworn affidavits, exhibits, and other evidence submitted

to the Court in support of the entry of a default judgment.  This case arises from the 1996 killing

of plaintiff's wife in Israel as the result of a suicide bombing allegedly sponsored by the

defendants and carried out by the Palestinian Islamic Jihad.


I.  PROCEDURAL HISTORY

        1.  On April 20, 2006, plaintiff filed his complaint in this Court seeking, among

other things, compensation for his emotional distress and economic loss due to the wrongful

death of his wife, Gail Belkin.

        2.  In accordance with the relevant provision of the Foreign Sovereign Immunities

Act, 28 U.S.C. § 1608(a), and 22 C.F.R. § 93.2, plaintiff caused the complaint, summons and

Notice of Suit, along with translations of each, to be served on each defendant, namely the

Islamic Republic of Iran ("Iran"), Iran's Ministry of Information and Security ("MOIS"), and the Islamic Revolutionary Guard Corp of Iran ("IRGC").

3. Service of process was initially attempted on each defendant in Tehran, Iran via DHL pursuant to 28 U.S.C. § 1608(a)(3) on July 6, 2006 and on August 18, 2006. The DHL packages were refused on August 26, 2006, and the return receipt was returned unexecuted on August 28, 2006.  Docket No. 5.

4. At plaintiff's request, the summonses were reissued on November 1, 2006, and on December 12, 2006 only as to Iran and MOIS, whereupon the Clerk of the Court was requested to assist with service of process under 28 U.S.C. § 1608(a)(4).  Docket No. 8.

5. Service of process was further attempted via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) on Iran and MOIS. On December 11, 2006, plaintiff made a request to the Clerk of the Court by letter. The Clerk of the Court transmitted the service documents to the State Department on January 25, 2007.  Docket No. 9.  The documents were transmitted to Iran's Ministry of Foreign Affairs via the Embassy of Switzerland on April 22, 2007 under cover of diplomatic notes, numbers 1069-IE and 1070-IE.  The Iranian Ministry of Foreign Affairs returned the documents after being served, but service was effective as of April 22, 2007 under 28 U.S.C. § 1608(c)(1).  Docket No. 10; *see also* Plaintiff's Exhibit 1.[1]

6. Defendants' answer was due on June 21, 2007.  Defendants Iran and MOIS failed to enter any appearance and failed to respond by that date.  To date, no responses have been made by either defendant.

---

[1]     Because there was no service on the IRGC, they will be dismissed from this action.

7.  On July 2, 2007, plaintiff requested the Clerk of this Court to enter a default, which was entered by the Clerk on July 6, 2007.  Docket No. 12.  On July 27, 2007, plaintiff moved for default judgment.  Docket No. 14.  On December 7, 2007, plaintiff made his evidentiary submission consisting of affidavits, videotapes, and documents to the Court.  Plaintiff submitted proposed findings of fact and conclusions of law.

8.  On March 28, 2008, prior to the Court ruling on plaintiff's motion for default judgment, plaintiff moved for leave to file a First Amended Complaint under the authority of Section 1083 of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. 110-181, which was signed by the President and enacted into law on January 28, 2008.  The First Amended Complaint was lodged with the motion.

9.  The Court granted leave to file the First Amended Complaint on June 17, 2008. The Amended Complaint added three additional causes of action under federal common law.  They are Wrongful Death (Count II), Solatium (Count III), and Intentional Infliction of Emotional Distress (Count IV-A).[2]

10.  Plaintiff continues to rely on his previously filed evidentiary submission in support of his renewed motion for default judgment (Docket No. 20) on the Amended Complaint. On a motion for default judgment brought against a foreign sovereign or its agencies or

---

[2]     The Amended Complaint deleted the previously made claims for damages under the District of Columbia's Survival Act and for loss of consortium.  Counts I and II of the First Amended Complaint charge the defendants with wrongful death, Count I under District of Columbia law and Count II under federal common law.  Count III charges loss of solatium under federal common law. Count IV and Count IV-A charge the intentional infliction of emotional distress, Count IV under District of Columbia law and Count IV-A under federal common law. Counts V through IX charge wrongful death, aggravated assault, violations of human dignity, and violations of international treaty obligations under the laws of Israel. Count X charges defendants with violation of customary international law (*jus cogens*).

instrumentalities, the claimant must establish his claim or right to relief by evidence satisfactory to the court. *See* 28 U.S.C. § 1608(e). The evidentiary submission was filed on December 7, 2007, and a courtesy copy delivered to Chambers. The Court finds that these evidentiary submissions are sufficient to establish plaintiff's claims.

## II.  FINDINGS OF FACT

1.  Plaintiff Lawrence Belkin is a United States citizen, born and raised in Pennsylvania. After graduating from the University of Michigan in 1969, he served three years in the United States Army and then four more years in the Army Reserve. After his active duty discharge, he attended graduate school in North Carolina where he received Masters Degrees in both Architecture and Regional Planning. He worked in North Carolina from 1973 until mid-1981 when he moved to Israel and opened his own architectural design firm. Plaintiff's Exhibit 2 ¶¶ 1-5 ("Belkin Declaration").

2.  When Mr. Belkin moved from North Carolina to Israel in 1981, he no longer maintained any residences or substantial contacts with any particular state in the United States. At the time he considered Israel to be his permanent residence. He did maintain general contacts with the United States government, including by filing his United States income tax returns each year while he resided in Israel. Belkin Declaration ¶ 6.

3.  Mr. Belkin married Gail Belkin on March 23, 1995. Gail Belkin had been born in Rhodesia and also lived in South Africa before she immigrated to Israel. English was her native language. By profession, she was a cosmetician and ran a successful business. She became a citizen and resident of Israel. At the time of her death, she was 48 years of age and had

two adult daughters from a previous marriage.  Belkin Declaration ¶ 10.

4.  At the time of his marriage to Gail Belkin, Mr. Belkin was a widower with two children.  His first wife died suddenly six years earlier in Israel when her car collided with a truck.  As a result of the loss of his first wife, the evidence submitted supports the factual assertion that Mr. Belkin felt compelled to be the best husband he could be to his new wife, and he was very close to her.  He made it a point to tell her every day how much he loved her, and often told her how he dreaded the thought of losing her through death as he did his first wife.  Gail Belkin was to be his companion for the rest of his life.   Belkin Declaration ¶ 8.

### A.  The March 4, 1996 Bombing Incident

5.  On the afternoon of March 4, 1996, Gail Belkin, her mother, and one of her daughters went shopping for a wedding dress in the Dizengoff Center Shopping Mall in Tel Aviv, Israel, as her daughter was engaged to be married.  After a time, the daughter remained in the mall shopping by herself while Gail Belkin and her mother went outside.  At approximately 4:00 p.m. on March 4, 1996, a suicide bomber affiliated with the Shaqaqi faction of the Palestinian Islamic Jihad ("PIJ") detonated a 40-pound bomb that he was carrying just outside the doors of the shopping mall in the vicinity of Gail Belkin and her mother. Gail Belkin and her mother, plus eleven others, mostly women and children, were killed in the blast. 125 other individuals were injured.  *Id.*; Plaintiff's Exhibit 3, Expert Report of Dr. Patrick Clawson ("Clawson Report") at 5, 8.[3]

---

[3]   Dr. Patrick Clawson has provided sworn expert testimony concerning the PIJ, Iran, MOIS and the IRGC in numerous cases before this Court.  In *Heiser* v. *Islamic Republic of Iran,* Dr. Clawson is described as a "renowned scholar of Middle Eastern politics, who has studied and written about Iran for years.  In over 20 cases, Dr. Clawson has provided this Court

6.   The PIJ suicide bomber was identified as Ramez abed el Kader Machmad Abid, a resident of the Chan-Yuness refugee camp in Gaza.  He was a known activist in the PIJ with the Shaqaqi faction.  The police investigation determined that Abid had been smuggled into Israel that day by a truck driver traveling from Gaza to Tel Aviv.  Clawson Report at 6, 8.  *See* Plaintiff's Exhibit 4, Israeli Police Report, Event 27126 ("Israeli Police Report").

7.   Abid carried the bomb in a black bag with two carrying handles.  The main explosive was approximately 15 kilograms of TNT, around which was packed number 10 nails so as to cause maximum pain, suffering, and death to anyone in the vicinity of the detonation.  The explosion was triggered by power from 9 volt batteries.  When he arrived at the Dizengoff Center, Abid attached the bag to his shoulders.  *Id*.

8.   The truck driver who drove Abid into Tel Aviv, Said Bin Hussain Sulimany, was subsequently indicted and prosecuted for smuggling Abid into Israel for the equivalent of $1,100, and for assisting in murder and sabotage.  Sulimany, who was convicted of providing support to terrorists, admitted that he knew Abid was a PIJ member and that he was paid the equivalent of $1,100 by a PIJ leader to smuggle Abid into Tel Aviv.  Clawson Report at 6.

9.   Both the PIJ and Hamas claimed responsibility for the Dizengoff Center bombing.[4]  There is evidence that Hamas provided the bomb and that the PIJ provided the suicide

---

with reliable and credible testimony regarding the involvement of Iran, MOIS and IRGC in sponsoring and organizing acts of terrorism carried out against citizens of the United States.  *See Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 265 (D.D.C. 2006).

[4]      Hamas, which is the popular name for the Islamic Resistance Movement (Harakat alMuqawama al-Islamiya), is an organization that has been supported over the years by the Islamic Republic of Iran, primarily through Iran's Ministry of Information and Security ("MOIS"), and its Revolutionary Guard Corps.  There are numerous opinions by judges of this Court which have found that Iran not only is a major source of support for Hamas, both

bomber and facilitated his transportation to Tel Aviv where the bomb was detonated.  The PIJ

and Hamas are known to have collaborated in other terrorist bombings, including an April 6,

1994 incident where the suicide bomber in a car-bomb attack on a bus in Afala, Israel was a

member of the PIJ, but the bomb was provided by Hamas.  *Id.* at 6-7.

       10.   The context for the PIJ's bombing of the Dizengoff Center was the ongoing peace

discussions between Palestinian President Yassar Arafat and Israel.  Iran, as well as its agents,

Hamas and the PIJ, was strongly opposed to any kind of recognition of Israel and sought by

violence the rejection of the Middle East peace process.  On February 28, 1996, Iranian Vice

President Habibi met with Hamas leaders and PIJ leaders (including Ramadan Abdallah Shallah)

in Damascus, Syria.  It was reported that Habibi stressed the continuation of Iran's support for

the Palestinian oppositionists working against the peace agreement.  Plaintiff's Exhibit 5,

Patterns of Global Terrorism, 1996; Clawson Report at 4.  This statement and meeting occurred

in the middle of several major bombings in Israel, including two February 25, 1996 bombings:

one of a bus in Jerusalem and the other of a soldier rest station in Ashkelon, plus a subsequent

bombing of another bus in Jerusalem on March 3, 2006.[5]  There is strong evidence that the

---

financially and in terrorist training, but also that Iran fully knew of the purposes and objectives of
Hamas and approved of them.  *See, e.g., Bennett v. Islamic Republic of Iran,* 507 F. Supp. 2d
117, 124 (D.D.C. 2007); *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 262
(D.D.C. 2003); *Stern v. Islamic Republic of Iran,* 271 F.Supp.2d 286 (D.D.C. 2003); *Mousa v.
Islamic Republic of Iran,* 238 F.Supp.2d 1, 3 (D.D.C. 2001); *Weinstein v. Islamic Republic of
Iran,* 184 F.Supp.2d 13 (D.D.C. 2002); *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1, 5
(D.D.C. 2000); *see also In re Abu Marzook,* 924 F. Supp. 565 (S.D.N.Y. 1996).

     [5]     This bus bombing in Israel has spawned four terrorism cases in this Court:  *Bodoff
v. Islamic Republic of Iran*, 424 F.Supp.2d 74 (D.D.C. 2006); *Mousa v. Islamic Republic of Iran,*
238 F.Supp.2d 1 (D.D.C. 2001); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C.
2002); *Eisenfeld v. Islamic Republic of Iran, 172* F.Supp.2d 1 (D.D.C. 2000).

Dizengoff Center bombing was actually planned to occur on February 25, 1996 in coordination with the two other bombings that did occur that day, but it did not occur because the truck driver, who was paid to drive the suicide bomber Abid into Tel Aviv, failed to show up that day.  Dr. Clawson opined that it was reasonable to conclude that at their meeting of February 28, 1996, Iran's Vice President Habibi discussed with PIJ leader Shallah Iran's support for the PIJ's suicide bombings against the Israelis.  The Dizengoff Center bombing happened a few days later.  *Id.* Credible reports describe how Iran pledged to increase support based on major terror killings carried out by the PIJ.  Clawson Report at 2.

11.   The autopsy of Gail Belkin was performed by forensic pathologists Yehuda Hiss, M.D. and R. Nachman, M.D.  They found that she had suffered first and second degree burns on her head, neck, trunk, and limbs.  There were numerous lacerations in those same areas.  Most significantly, the force of the explosion caused fractures of her cranial and facial bones as well as her ribs.  It was the opinion of the forensic pathologists that the cause of Gail Belkin's death was the detonation of explosives.  Plaintiff's Exhibit 6, Autopsy Report.

12.   As a result of the death of Gail Belkin, her estate suffered economic losses. This loss is based on a projected work history of 19 additional years to retirement age and then receipt of a pension for 15 years to her life expectancy of 82.7 years, based on the Israeli Bureau of Statistics life expectancy tables.  The total lost wages for those 34 years as reduced to present value is $376,848.  She also had funeral expenses totaling $3,710, for a total of $380,558.  *See* Plaintiff's Exhibit 10, Economic Report of Dov Weinstein, CPA ("Weinstein Report").

13.   Lawrence Belkin suffered severe emotional distress as the result of the bombing and gruesome death of his wife.  While not present at the Dizengoff Center at the actual

time of the bomb's detonation, he learned about the bombing very shortly after it occurred, and

he was immediately filled with anxiety knowing that his wife was then at the shopping center.

His fear and concern increased with each passing minute when he did not hear from his wife.

14.   The entire country of Israel was at a heightened state of tension and fear as the

result of the spate of bombings that had recently happened and which took the lives of numerous

innocent civilians, many of them children.   The anxiety immediately increased with the television

media immediately broadcasting photographs of the massive damage at the area around the

Center.   Mr. Belkin was sickened as he watched the special crews of workers scouring the scene

for every piece of human flesh that could be recovered, in accordance with Jewish law.   *See*

Belkin Declaration ¶ 10; *see also* Plaintiff's Exhibit 7 (DVD of Israeli news showing

post-bombing activity outside the Dizengoff Center).

15.   Lawrence Belkin's anxiety further increased with each call to a hospital

which responded that it had no information about a Gail Belkin.   The hospitals told him he

should consider calling the morgue.   Within hours of the bombing, he was taken to the morgue to

view the body of a woman believed to be his wife.   The body was so severely injured in the blast

that he could not identify his own wife while viewing it.   He was only able to identify the jewelry

that she was wearing, particularly her distinctive wedding ring which he had given to her. Belkin

Declaration ¶ 11.

16.   For over two years after his wife's death, Lawrence Belkin attended group

therapy sessions to deal with his grief and emotions.   The program was operated by the Israeli

government and all of the participants were spouses of victims of terrorism.   Even into 2004,

eight years after Gail Belkin's murder, he was treated by his physician for "Generalized Anxiety

Disorder" which was attributed to Gail Belkin's death and his experiences in Israel.  On

occasion, he still experiences an overwhelming sense of anxiety associated with the events of his

wife's death.  Belkin Declaration ¶¶ 12-14.

17.  In 2001, Lawrence Belkin decided to move back to the United States to an

environment of greater quiet and less intensity.  He currently resides in the Commonwealth of

Virginia.  Belkin Declaration ¶ 14.

### B.  The Palestinian Islamic Jihad

18.  The Palestinian Islamic Jihad was founded by Sunni Islamic fundamentalist Fathi

Shaqaqi in the 1970s.  Almost from the outset, PIJ leaders have proudly proclaimed their close

connection with the Iranian government.  In 1981, Fathi Shaqaqi wrote a book about his

admiration for the Islamic Republic of Iran.  Particularly remarkable about the PIJ's long

affiliation with Iran is how they have always worked together cooperatively notwithstanding the

longstanding disagreements between the Sunni and Shia Muslim factions, on both religious and

socio-economic grounds.  PIJ leaders traveled frequently to Iran, often being shown in the Iranian

media meeting with top officials in the Iranian government.  The PIJ actively defended Iran and

its ideology to Sunni extremists who were put off by Iran's Shiite majority.  Clawson Report at

2-3; Plaintiff's Exhibit 8, Dr. Clawson's testimony in *Flatow v. Islamic Republic of Iran,* Civil

Action No. 97-396 (March 3, 1998) ("Clawson Testimony") at 146-147.

19.  After the 1987 outbreak of a Palestinian popular uprising against Israel, the

PIJ was the group which most loudly and openly proclaimed the need for terrorist attacks on

Israeli civilians at a time when most other Palestinian extremists thought such attacks were

unwise tactics.  The Shaqaqi faction of the PIJ was relatively small, numbering a few hundred members, but it was particularly violent. For the next 12 years, the PIJ had few activities other than carrying out terrorist acts (unlike other terrorist groups such as Hamas and Hezbollah which also undertook charitable and political activities).  Clawson Report at 2-4; Clawson Testimony at 148; Plaintiff's Exhibit 9, testimony of terrorism expert Harry B. Brandon in *Flatow v. Islamic Republic of Iran,* Civ. Action No. 97-396 ("Brandon Testimony") at 174.

      20.  The PIJ has been found responsible for many other terrorist attacks in Israel, including the April 9, 1995 bus bombing in which Alisa Flatow was killed and Seth Haim was severely injured.  *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1 (D.D.C. 1998); *Haim v. Islamic Republic of Iran,* 425 F.Supp.2d 56 (D.D.C. 2006).

### C.  Iran's Support for the PIJ

      21.  In the mid-1990s, Iran had an urgent desire to disrupt the Middle East peace process which appeared to be moving forward at that time.  Iran considered terrorist activities in Israel and the murder of Israeli civilians carried out by the PIJ as an effective means of damaging relations between Israel and the Palestinian Authority.  According to Dr. Clawson, by supporting the PIJ, Iran enhanced its standing with radical Islamic extremists, especially among Sunni Muslims who would otherwise be hostile to the Shiite Islamic Republic of Iran.  Iran provided the PIJ not only with financing, but also with advanced military training and munitions technology that allowed the PIJ to evolve into a dangerous and effective terrorist organization. Clawson Report at 2.

22.  In 1990, after Fathi Shaqaqi arrived in Damascus, PIJ operatives began training at Hezbollah camps in Lebanon under the supervision of Iranian Revolutionary Guards stationed in that country and carried out some joint operations with Hezbollah against Israeli forces in south Lebanon.

23.  The strong consensus among scholars of Palestinian extremism is that from 1988 until about 2000, the PIJ was heavily dependent on Iranian government support.  Several experts, including Dr. Reuvan Paz and Harry B. Brandon, the former Chief of the FBI's Counterterrorism Section, opined in 1998 that the Iranian government was virtually the sole support of the PIJ.  While in a 1994 interview of Fathi Shaqaqi by Arab journalists, Shaqaqi denied the accepted figure that the PIJ was receiving $20,000,000 that year from Iran, he did admit receiving $3,000,000 to support PIJ terrorism.  Clawson Report at 4-5 (citing testimony from Dr. Paz); Brandon Testimony at 176.

24.  The Iranian Ministry of Information and Security, during the 1990s and beyond, acted as a conduit for the Islamic Republic of Iran's provision of funds and training to the Shaqaqi faction for its terrorist activities in the Gaza strip region.  Clawson Report at 5.

25.  The PIJ's dependence on Iran deepened after the 1995 death of Fathi Shaqaqi.[6]  Shaqaqi's successor Shallah faced the challenge of showing that the PIJ was still an important force, especially as the larger Hamas organization had stepped up its terroristic activities.  In the weeks prior to the Dizengoff bombing, Hamas had stepped up its activities to undermine Arafat and the Palestinian Authority.  On the day before the Dizengoff bombing, in

---

[6]     Fathi Shaqaqi was shot and killed on October 26, 1995 by an unknown professional assassin, generally believed to be an Israeli operative.

response to Israeli pressure following the spate of suicide bombings, Arafat outlawed

paramilitary organizations including Hamas and the PIJ, and Palestinian police arrested 800

Islamic militants and seized large quantities of explosives.  Clawson Report at 4.

26.  The Patterns of Global Terrorism was an annual report by the State

Department based on statistical data on significant international terrorist incidents (the State

Department now publishes similar information in its Country Reports on Terrorism).  The

Patterns of Global Terrorism report for 1996, the year in which the bombing that killed plaintiff's

wife occurred, stated: "Iran remained the premier state sponsor of terrorism in 1996 . . .  Iran

continued to provide support – including money, weapons and training – to a variety of terrorist

groups, such as Hezbollah, Hamas and the Palestine Islamic Jihad ("PIJ")."  Plaintiff's Exhibit 5.

27.  Iran was designated a state sponsor of terrorism in 1984 and has been on the

State Department's list of state sponsors of terrorism ever since.  *See Dammarell v. Islamic*

*Republic of Iran,* 404 F.Supp.2d 261, 273-74 (D.D.C. 2005); *see also* 22 C.F.R. § 126.1(d)

(2008); 31 C.F.R. § 596.201 (2009); Determination Pursuant to Section 6(I) of the Export

Administration Act of 1979--Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).

28.  The Ministry of Information and Security ("MOIS"), Iran's intelligence

service, is a major Iranian agency designated by Iran to help organize Iranian government support

to the PIJ. MOIS operates both within and beyond Iranian territory.  With approximately 30,000

agents, MOIS is the largest intelligence agency in the Middle East.  MOIS acted as a conduit for

Iran's provision of funds and training to the Shaqaqi faction of the PIJ for its terrorist activities.

Iran's intelligence services facilitate and direct terrorist attacks.  MOIS's provision of material

support and resources for terrorism is conducted with the approval of the highest levels of the

Iranian regime. Clawson Report at 5, 7; *accord, Haim v. Islamic Republic of Iran,* 425 F.Supp.2d at 61; *Flatow v. Islamic Republic of Iran,* 999 F. Supp. at 11.[7]

29.   Another means by which Iranian support for terrorism is carried out is through the Iranian Revolutionary Guard Corps ("IRGC"), the activities of which are carefully controlled by the Iranian government.  Since 1988, scores of PIJ operatives from the West Bank and Gaza have received Iranian military and terrorist training at bases run by the IRGC in Lebanon and in Iran itself.  Iran has provided the PIJ with explosives and weapons, as well as the training required to use such weapons.  It is reasonably believed that these weapons came from IRGC stocks or through IRGC channels.  Clawson Report at 7-8.

30.   Dr. Clawson opined, to a reasonable degree of certitude, that the Islamic Republic of Iran, through its agencies MOIS and the IRGC, provided funding and training to the PIJ both before and after March 4, 1996 in order to facilitate the PIJ's ability to carry out terroristic activities, including suicide bombings, and particularly the suicide bombing on March 4, 1996 of the Dizengoff Center.  Such training would include how to operate explosive devices and how to achieve maximum death and destruction. Iran, through MOIS and the IRGC, would have provided funding to carry out terrorist attacks, including payment for smuggling the suicide bomber through Israeli security to the place of detonation.  Clawson Report at 8.

---

[7]   Although not necessary to the resolution of this case, the Court may take judicial notice of facts and conclusions made by Judge Lamberth in the *Flatow* and *Haim* cases.  While the event underlying those two cases occurred eleven months prior to the event in this matter, the longstanding relationship between Iran and the PIJ found by the Court in those two cases (that were decided eight years apart) is relevant to this case, particularly so because they are so consistent.  *See Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d at 262-263; *Haim v. Islamic Republic of Iran,* 425 F.Supp.2d at 60; *Flatow v. Islamic Republic of Iran,* 999 F. Supp. at 14; FED. R. EVID. 201(e).

III.  CONCLUSIONS OF LAW

*A.  Jurisdiction*

The Foreign Sovereign Immunities Act ("FSIA") establishes the general principle that foreign states are immune from suit in United States courts.  The statute also sets out certain exceptions to the rule for limited categories of cases.  Thus, the FSIA provides the sole basis for asserting jurisdiction over foreign sovereigns.  *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434-34 (1989).  A party may not generally bring an action for money damages in U.S. courts against a foreign state. 28 U.S.C. § 1604.  The "state-sponsored terrorism" exception, now set forth at 28 U.S.C. § 1605A and formerly at 28 U.S.C. § 1605(a)(7), removed a foreign state's immunity from suits for money damages brought in U.S. courts where plaintiffs seek damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources" for such an act if such act or provision of material support "is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency."  28 U.S.C. § 1605A(a)(1); *see Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d at 304.

On January 28, 2008, the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, repealed Section 1605(a)(7) of Title 28 and replaced it with a new section codified at Section 1605A of the same title.  *See Simon v. Republic of Iraq,* 529 F.3d 1187, 1189 (D.C. Cir. 2008), *rev'd on other grounds*, 129 S. Ct. 2183.[8]

---

[8]       Where a pending action was brought under 28 U.S.C. § 1605(a)(7) and is not refiled under Section 1605A, the district courts retain jurisdiction pursuant to § 1605(a)(7) over cases that were pending under that section when Congress enacted the NDAA.  *See Simon v.*

Section 1083(c)(3) of the NDAA, in relevant part, authorizes a plaintiff who has "timely commenced" a "related action" under Section 1605(a)(7), to bring any other action arising out of the same act or incident," provided that "the [new] action is commenced" within 60 days of "the date of the enactment of [the NDAA]." *Simon v. Republic of Iraq,* 529 F.3d at 1192. The NDAA was enacted on January 28, 2008. Plaintiff Lawrence Belkin commenced this "related action" on March 28, 2008, within the 60-day window of the NDAA.

In order to subject a foreign sovereign to suit under Section 1605A, a plaintiff must show that: (1) the foreign sovereign was designated by the State Department as a "state sponsor of terrorism" when the acts occurred and remains so designated when the matter was refiled, 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) that the victim or claimant was a U.S. national at the time the acts took place, *see* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I); and (3) that the foreign sovereign engaged in conduct that falls within the ambit of the statute. *See* 28 U.S.C. § 1605A(a)(1).[9]

Each of the requirements is met in this case. First, defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. *See* 22 C.F.R. § 126.1(d) (2008); 31 C.F.R. § 596.201 (2009). Second, the plaintiff was a United States citizen when the murder of the decedent occurred and at the time plaintiff filed this action. Finally, defendant Iran's persistent financial and organizational material support of the entity or entities that committed an extrajudicial

---

*Republic of Iraq,* 529 F.3d at 1192.

[9] Section 1605A expanded the potential class of plaintiffs by including any member of the armed forces or any employee or contractor of the U.S. government, regardless of nationality. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(II) and (III).

killing and the provisions of material support has been established and it falls squarely within the

ambit of the statute.[10]   Defendants MOIS and the IRGC are political subdivisions of the State of

Iran, and therefore are treated as members of the State of Iran itself.   *Roeder v. Islamic Republic*

*of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003), *cert. denied,* 542 U.S. 915 (2004); *see also Salazar*

*v. Islamic Republic of Iran,* 370 F.Supp.2d 105, 116 (D.D.C. 2005) (analogizing the IRGC to the

MOIS for purposes of liability, and concluding that both must be treated as the State of Iran

itself).   Therefore, the same determinations that apply to the conduct of MOIS and the IRGC

apply to the conduct of Iran.

## B.  Service of Process

Personal jurisdiction exists over a non-immune sovereign as long as service of

process has been made under Section 1608 of the FSIA.   *See Stern v. Islamic Republic of Iran,*

271 F.Supp.2d at 298 (D.D.C. 2003); *see also* Fed. R. Civ. P. 4(j).   Service of the original

complaint was effected on all three Defendants under 28 U.S.C. § 1608(a)(4).   *See* Plaintiff's

Exhibit 1.   Plaintiff did not serve the amended complaint on defendants.   Where changes made in

an amended complaint are "not substantial," the requirement of Rule 5(a)(2) of the Federal Rules

of Civil Procedure that a pleading that states a new claim for relief against a party in default must

be served on that party is not applicable.   *See* FED. R. CIV. P. 5(a)(2); *see also Blais v. Islamic*

*Republic of Iran*, 459 F. Supp. 2d 40, 46 (D.D.C. 2006); *Dammarell v. Islamic Republic of Iran*,

---

[10]      The FSIA utilizes the same definition of "extrajudicial killing" as the Torture
Victim Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberate killing
not authorized by a previous judgment pronounced by a regularly constituted court affording all
judicial guarantees which are recognized as indispensable by civilized people."   *See* 28 U.S.C.
§ 1605A(h)(7); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003).

370 F. Supp. 2d 218, 224 (D.D.C. 2005).   Plaintiff's amended complaint did not substantially

change the allegations in the original complaint and did not add new defendants.   The causes of

action are essentially the same, but, as explained below, are now available under another source

of law — namely, Section 1605A.   The Court will not require the plaintiff to serve the amended

complaint.   *See Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d at 46 (amended FSIA

complaint which added causes of action based on state substantive law as well as the federal

statutory scheme need not be served on foreign sovereign in default); *Dammarell v. Islamic

Republic of Iran*, 370 F. Supp. 2d at 224.   Accordingly, this Court has *in personam* jurisdiction

over defendants Iran, MOIS and the IRGC.

## C.  Legal Standard for FSIA Default Judgment

In an action over which subject matter jurisdiction exists by virtue of the

"terrorism exception" of 28 U.S.C. § 1605A, "[n]o judgment by default shall be entered by a

court of the United States or of a state against a foreign state . . . unless the claimant establishes

his claim or right to relief by evidence satisfactory to the court."   28 U.S.C. § 1608(e); *see

Roeder v. Islamic Republic of Iran,* 333 F.3d at 232-33.   In default judgment cases, plaintiffs may

present such evidence in the form of affidavits or declarations rather than through live witnesses

testifying in open court.   *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d at 82; *Campuzano v.

Islamic Republic of Iran,* 281 F.Supp.2d 250, 268 (D.D.C. 2003).   Upon evaluation, the Court

may accept any uncontroverted evidence presented by plaintiffs as true.   *Heiser v. Islamic

Republic of Iran*, 466 F.Supp.2d at 255 (*citing Campuzano v. Islamic Republic of Iran,* 281

F.Supp.2d at 268).   This Court accepts and credits the uncontested evidence and testimony

submitted by plaintiff and his witnesses in this case as true.   Not only have the defendants in this action not objected to such evidence or even appeared to contest it, but the Court finds the evidence submitted by plaintiff to be relevant and highly probative of the claims asserted.

### D.  Governing Law

The FSIA, as amended, creates a federal cause of action against foreign states, for which both compensatory and punitive damages may be awarded, for personal injury or death caused by an extrajudicial killing or by the provision of material support or resources by the foreign state, among other acts.  *See* 28 U.S.C. § 1605A(a)(1) and (c)(1); *see also Simon v. Republic of Iraq,* 529 F.3d at 1190.  This area of law has been in flux.  In 2004, the court of appeals held that while the FSIA waived sovereign immunity for state sponsors of terrorism, it did not "create[] a private right of action against a foreign government."  *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024, 1033 (D.C. Cir. 2004).  In the same year, the court of appeals also held that FSIA plaintiffs cannot state a claim against foreign states under the "generic common law" but must "identify a particular cause of action arising out of a specific source of law."  *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004).  These decisions left FSIA plaintiffs with the option of suing foreign officials for damages in their personal capacities, a cause of action which was created by the Flatow Amendment, P.L. 104-208, 110 Stat. 3009-172 (published as a note to 28 U.S.C. § 1605), or to advance claims against the foreign state based on a specific, non-federal source of law, such as the law of the U.S. state that is or was the domicile of the injured party or decedent.  *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 65 (D.D.C. 2008).

Section 1605A of the NDAA changed the mechanism for recovery by creating a federal private right of action against foreign state sponsors of terrorism for compensatory damages for economic loss, solatium, and pain and suffering, as well as for punitive damages. See 28 U.S.C. § 1605A(a) and (c); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 25 (D.D.C. 2008). Now that Congress has created an express federal cause of action, neither the Court nor plaintiff need rely on state tort theories of recovery for plaintiff's claims. *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d at 65-66 ("By providing for a private right of action and by precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in these cases when they are decided under state law.").

### E. Vicarious Liability for the Torts Committed by the PIJ

One of the substantive bases of the defendants' liability is that at a minimum they engaged in the "provision of material support and resources" to the PIJ, which carried out the terrorist bombing of the Dizengoff Center and caused the death of Gail Belkin. The acts of another may render a party liable "under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement." *Haim v. Islamic Republic of Iran,* 425 F.Supp.2d at 69. This Court finds that civil conspiracy provides a basis of liability for defendants Iran and MOIS and, accordingly, it declines to reach the issue of whether they might also be liable on other theories of liability. *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d at 26; *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d at 266-68.

The elements of civil conspiracy consist of (1) an agreement between two or more persons or entities; (2) to participate in an unlawful act or in an otherwise lawful act in an unlawful manner; (3) that an injury or death or other damages was caused by an unlawful overt

act performed by one of the parties to the agreement and (4) pursuant to or in furtherance of the

common scheme.  *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. at 27 (*citing Halberstam*

*v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983)).

       It is axiomatic that the "agreement" element "may be inferred from conduct."

*Bodoff v. Islamic Republic of Iran*, 424 F.Supp.2d at 84 *(citing Weishapl v. Sowers,* 771 A.2d

1014, 1023 (D.C. 2001)); *see also Haim v. Islamic Republic of Iran,* 425 F.Supp.2d at 69.  Based

on the evidence submitted to this Court, most notably the Clawson Report, plaintiffs have

established that Iran, MOIS, the IRGC and the PIJ acted in concert because they had agreed to

commit high profile terrorism activities to promote Iran's brand of revolutionary Islamic ideology

and to further the goal of damaging Israel and its citizens as well as United States' interests

whenever possible.  Clawson Report at 3-4.  Such agreement also may be inferred from the

substantial financial support and training that Iran, MOIS and the IRGC provided to the PIJ.  *See*

*id.* at 2-4.  The very "'sponsorship of terrorist activities inherently involves conspiracy to commit

terrorist acts.'"  *Bodoff v. Islamic Republic of Iran*, 424 F.Supp.2d at 84 (quoting *Flatow v.*

*Islamic Republic of Iran*, 999 F. Supp. at 27).

       The evidence also clearly establishes that the PIJ carried out the sequence of

conduct that killed the decedent.  *See* Clawson Report at 5-7.  Dr. Clawson's Report also

demonstrates to the satisfaction of this Court that the torts alleged by plaintiffs were carried out

in "furtherance of the scheme" between the PIJ, Iran, MOIS, the IRGC, and likely Hamas, to

disrupt the Middle Eastern peace talks.  *See id.* at 6.  For these reasons, each of the four elements

of civil conspiracy is established under District of Columbia law, with regard to the defendants

and the PIJ perpetrators.  *See also Valore v. Islamic Republic of Iran,* 478 F.Supp.2d 101, 108-09

(D.D.C. 2007) (civil conspiracy basis for vicarious liability established with respect to Iran and

MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks

in Beirut).

### F.  Solatium and Intentional Infliction of Emotional Distress

Count III of the First Amended Complaint seeks damages for solatium under 28

U.S.C. § 1605A(c).  Counts IV and IV-A of that complaint seek damages for intentional

infliction of emotional distress, under both the common law of the District of Columbia and

under Section 1605A(c).  The courts in this jurisdiction have generally viewed solatium and

intentionally inflicted emotional distress claims as being closely connected.  *See*, *e.g.*, *Surette v.*

*Islamic Republic of Iran,* 231 F.Supp.2d 260, 267 n.5 (D.D.C. 2002) ("In the context of FSIA

cases, this Court has recognized the claim of solatium as . . . indistinguishable from the claim of

intentional infliction of emotional distress").  Plaintiff recognizes that there can be but one award

of damages for the claims made in Counts III, IV and IV-A.  Because section 1605A explicitly

makes damages for solatium available, the Court will proceed under this theory of recovery.  *See*

28 U.S.C. § 1605A(c).

A claim of solatium is a claim for the mental anguish, bereavement and grief that

those with a close personal relationship to a decedent experience as the result of the decedent's

death, as well as the harm caused by the loss of the decedent, society and comfort.  *Dammarell v.*

*Islamic Republic of Iran,* 281 F. Supp. 2d 105, 196-97 (D.D.C. 2003); *Elahi v. Islamic Republic*

*of Iran,* 124 F.Supp.2d 97, 110 (D.D.C. 2000).  Acts of terrorism are by their very definition

extreme and outrageous and intended to cause the highest degree of emotional distress.  *Stethem*

*v. Islamic Republic of Iran,* 201 F. Supp. at 89. Prior to the *Cicippio-Puleo* decision, courts regularly recognized the distress of spouses of terrorism victims by awarding solatium damages to such spouses.  *See Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 23 (D.D.C. 2002); *Higgins. v. Islamic Republic of Iran,* 2000 WL 33674311 at *7-8 (D.D.C. Sept. 21, 2000); *see also Alejandre v. Republic of Cuba,* 996 F. Supp. 1239, 1249 (S.D. Fla. 1997).  The Court will award damages to Mr. Belkin under Count III.

### G.  Plaintiff's Wrongful Death Claims

Count I alleges wrongful death under District of Columbia law (16 D.C. Code § 2701); Count II alleges wrongful death under 28 U.S.C. § 1605A(c); and Count V alleges wrongful death under Israeli law.  Each of these counts seek essentially the same remedy — compensation for economic losses in the form of lost wages, benefits, retirement pay and funeral expenses incurred as the result of the extrajudicial killing of Gail Belkin under the direction of defendants.  Plaintiff recognizes that only one recovery for these economic damages is permissible.  Section 1605A(c) explicitly provides for economic damages for a death caused by a foreign state sponsor of terrorism.  *See* 28 U.S.C. § 1605A(a).  Accordingly the Court will award damages under Count II.  *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d at 69.

# IV.  DAMAGES

## A.  Compensatory Damages[11]

To obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were "'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of the damages by a 'reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'"  *Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d at 115-16 (quoting *Hill v. Republic of Iran,* 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)).  Because there have been so many cases in this District where family members have been killed by terrorist bombings, this Court is by no means writing on a proverbial "clean slate" in fashioning a damages remedy in this case.  To the contrary, this Court is guided by remedial approaches and formulas, utilized in similar cases. *Prevatt v. Islamic Republic of Iran,* 421 F. Supp.2d 152, 160 (D.D.C. 2006); *Haim v. Islamic Republic of Iran,* 425 F.Supp.2d at 71.

In determining the appropriate award of damages for solatium, the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium.  *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d at 29. While the loss suffered by a spouse is difficult to quantify, courts typically award between $8 million and $12 million for the emotional distress resulting from the death of a spouse.  *See, e.g.*, *id*. at 30 ($ 8 million to wife of target of terrorist assassination); *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d at 293 (relying on solatium cases to find that range of compensatory

---

[11]     Plaintiff has withdrawn his punitive damages demand.  *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law in Support of Renewed Motion for Default Judgment at 31-32.

damages for spouses is $8-12 million); *Greenbaum v. Islamic Republic of Iran,* 451 F.Supp.2d 90, 107-108 (D.D.C. 2006) ($9 million to husband of woman killed by suicide bomber); *Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d at 116 (awarding $10 million to the widow of a bombing victim); *Kerr v. Islamic Republic of Iran,* 245 F.Supp.2d 59, 64 (D.D.C. 2003) (award of $10 million to the widow of a torture and hostage taking victim).  One recent award to a spouse was for $30 million.  *See Estate of Bayani v. Islamic Republic of Iran,* 530 F.Supp.2d 40, 46 (D.D.C. 2007) ($30 million awarded to spouse whose husband was tortured and executed).

Based upon the wealth of cases involving immediate family members of civilians killed in terrorist bombings, this Court awards solatium damages of $10 million to plaintiff in his capacity as the husband of the decedent.  The Court believes this award is appropriate in this case as it is not unlike the awards to other spouses whose wives or husbands were killed in suicide bombings.  *See Greenbaum v. Islamic Republic of Iran,* 451 F.Supp.2d at 107-08.  The Court believes, however, that this plaintiff in particular is entitled to this higher award due to the extreme shock he experienced when he had to view his wife's severely disfigured body shortly after the bombing occurred. Such a shocking experience is one that he will never be able to put out of his mind and that will long continue to cause pain and anxiety.  For that reason, the Court will award plaintiff $10 million on his solatium claim.

To compute the economic damages associated with plaintiff's death, plaintiff has submitted a report from forensic economic expert Dov Weinstein, Plaintiff's Exhibit 10, Weinstein Report.  The Weinstein Report bases its calculations on reasonable and well-founded assumptions about the likely earnings of Gail Belkin had she survived.  *Id.*  Mr. Weinstein concluded that Mrs. Belkin would have worked for 19 more years and then, based on her life

expectancy, received a pension for 15 additional years.  Based upon this forensic evidence, the

lost wages of Gail Belkin reduced to present value would be $376,848.  *See Gates v. Syrian Arab*

*Republic*, 580 F. Supp. 2d at 69 (computing present value of the anticipated earnings of victims

of terrorism to award economic damages pursuant to Section 1605A(c)).  The additional amount

of $3,710 is for Mrs. Belkin's funeral expenses.  *See* Findings of Fact ¶ 12.  Accordingly, the

Court awards plaintiff wrongful death damages in the amount of $376,848 and $3,710, for a total

of $380,558.


### B.  Prejudgment Interest

Plaintiff requests prejudgment interest for his solatium claim (formerly his IIED

claim).  "It is within this Court's discretion to award plaintiffs prejudgment interest from the date

of the bombing . . . until the date of final judgment . . . [c]ourts in this Circuit have awarded

prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their

injuries – including, specifically, where such injuries were the result of targeted attacks

perpetrated by foreign defendants."  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530

F.Supp.2d 216, 263 (D.D.C. 2008) (relying on *Oldham v. Korean Air Lines Co.,* 127 F.3d 43, 54

(D.C. Cir. 1997); and *Forman v. Korean Air lines Co.,* 84 F.3d 446, 450 (D.C. Cir. 1996)); *see*

*also Ben Rafael v. Islamic Republic of Iran*, 540 F.Supp.2d 39, 59 (D.D.C. 2008).  The Court

agrees that prejudgment interest is appropriate in this case and awards plaintiff prejudgment

interest on his solatium claim computed at a rate of six percent per annum on a simple interest

basis from March 4, 1996 to the present.

*C.  Other Causes of Action Asserted in the Complaint*

In light of these Findings of Fact and Conclusions of Law, it is not necessary for

the Court to address the other claims asserted by the plaintiff under either Israeli law or under

customary international law.  *See Beaty v. Islamic Republic of Iraq,* 480 F.Supp.2d at 92-93.

(Count X).

## V.  CONCLUSION

For the reasons explained above, the Court will award judgment for plaintiff on

Counts II and III of his amended complaint and will dismiss the remaining counts.  Because

plaintiff has established a right to damages as a direct and proximate result of defendants'

extreme and outrageous conduct and because the evidence in the record amply supports the

allegations in the complaint, a judgment consistent with these findings will be entered against

defendants Iran and MOIS in the amount of $10 million for solatium, plus prejudgment interest

at the rate of six percent per annum, dated to March 4, 1996 when Gail Belkin was murdered, as

well as $376,858 in lost wages and $3,710 in funeral and burial costs under plaintiff's wrongful

death claim.

An Order in accordance with these Findings of Fact and Conclusions of Law shall

issue as of the date of this Opinion.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  September 30, 2009

27